Present:  Hassell, C.J., Lacy, Keenan, Koontz, Lemons, and Agee, JJ., and Carrico, S.J.

MARIE M. SMITH,
EXECUTOR OF THE ESTATE OF MICHAEL R. SMITH

v.  Record No. 040349   OPINION BY JUSTICE BARBARA MILANO KEENAN
                                November 5, 2004
DECLAN IRVING, M.D., ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Russell I. Townsend, Jr., Judge Designate

In this appeal of a judgment in favor of a defendant physician in a medical malpractice action, we consider whether the circuit court abused its discretion in refusing to permit the plaintiff to cross-examine the defendant regarding "standard of care" issues.

We will state the evidence in the light most favorable to the defendant, Declan Irving, M.D., the prevailing party in the circuit court.  See City of Richmond v. Holt, 264 Va. 101, 103, 563 S.E.2d 690, 691 (2002); Tashman v. Gibbs, 263 Va. 65, 68, 556 S.E.2d 772, 774 (2002).  Dr. Irving is a general surgeon whose practice includes treating obese patients by performing gastric bypass surgery to help them lose weight.  In January 1999, Dr. Irving evaluated the plaintiff's decedent, Michael R. Smith, for this purpose and ordered gastric bypass surgery to reduce the size of his stomach.

Dr. Irving performed the surgery in February 1999.  After the surgery, Dr. Irving and other physicians conducted several

tests to ensure that the surgery was successful and that the decedent's gastrointestinal tract was not leaking its contents. The tests did not reveal a leak, and the decedent's condition improved over the next few days.

One week after the surgery, the decedent's stomach unexpectedly perforated at the location where it had been surgically "closed off." The contents of the decedent's stomach escaped into his abdominal cavity, causing a condition known as peritonitis. After surviving surgery to repair his ruptured stomach, the decedent died from complications related to the peritonitis.

Marie M. Smith, executor of Michael R. Smith's estate, filed a wrongful death action against Dr. Irving and his professional corporation, Coastal Surgical Associates, Inc., alleging that Michael Smith died as a result of Dr. Irving's negligent medical treatment. Smith alleged that Dr. Irving was negligent in the manner that he conducted the gastric bypass procedure, in failing to identify and properly treat the symptoms of a gastric leak, and in delaying corrective surgery.

At trial, Smith and Irving each presented the testimony of two general surgeons who qualified as expert witnesses and testified about the applicable standard of care for the performance of gastric bypass surgery and the postoperative management of surgical patients undergoing this procedure. Dr.

Irving was not designated as an expert witness by either party, but testified in his own defense about his treatment and care of the decedent.

On direct examination, Dr. Irving testified regarding the general procedures involved in gastric bypass surgery:

Q:   Can you explain to us what the surgery was that
     you performed using [a diagram displayed in
     court]?

A:   The surgery consists of stapling right across the
     stomach with a device that has four rows of
     staples.  And what you have to do is get across
     the top of the stomach and leave a little area
     here that's roughly the size of a shot glass....
     What we do is divide this roughly, I think it's
     about 18 inches on average, but 45 centimeters
     from here to here.  You divide that, then we
     bring this part all the way up here to the
     stomach.  What happens now is the food comes into
     the stomach.  It's a very small, tiny stomach,
     quickly fills up and empties fairly slowly into
     this loop and it is moved with the rest of the
     colonic contents.  It allows only very, very
     small food intake and is a metabolically
     satisfactory operation that doesn't cause any
     side effects.

In response to his counsel's questions, Dr. Irving explained the techniques usually employed by physicians performing this type of surgery, and the actions he took during the course of the decedent's surgery:

A:   The tissues lay together and at that time you
     have to test it for a leak at the end because a
     leak can occur.  And what we do is we use saline
     which is a physiologic form of water with salt
     and blue dye and force that into the stomach
     under pressure and also into the bowel that's
     hooked up to it.  So that's inserted under

3

pressure by the anesthesiologist and they blow it up to a preset tension and you can feel it with your hand. And if it doesn't leak under pressure, you're usually pretty certain that there is no leak at that time.

Q:    Why didn't you place a surgical drain in [the decedent]?

A:    There was no evidence of a leak. It went together. It was a good anastomosis. The thing about putting in a surgical drain is you don't know if it's going to be at the site where the leak might occur. It could leak a centimeter away and it wouldn't pick it up. It will only pick it up right where the leak was. If it leaked on the other side it wouldn't help at all.

Also, they're a pathway for infection to come into the body as well as for drainage to come out. So unless you have certainty that you're going to actually have drainage, I don't think you should do it.

Dr. Irving also referred to his experience and knowledge when testifying about his treatment decisions:

Q:    Now, we talked a lot in this case about gastrografin and swallows. Are you familiar with that study?

A:    Yes, after each of these procedures many surgeons, not all, do a gastrografin swallow. And I thought that it was important in this particular case because he had a little, what I call at the time a little tension getting everything together. And I have never not done one on anybody, but many doctors don't. But in this case I thought that he needed a swallow to determine is there a leak after the surgery, is everything together and working okay.

On cross-examination, Smith's counsel questioned Dr. Irving about his training and knowledge of postoperative procedures:

4

```
Q:    If [patients] have a suspicion of a leak they
      should not be given anything by mouth?

A:    Probably not, no, depending on the situation.

Q:    And you were trained at that?

A:    Correct.  There are many other parts of the
      intestine that can leak besides this and it
      depends on the situation.  There's no hard and
      fast rule about it.

Q:    Well, the standard of care requires that a
      patient with a leak should not have fluids by
      mouth, correct?
```

Defense counsel objected to this last question on the ground that Dr. Irving had "not been designated as an expert witness on what the standard of care is."  The circuit court sustained the objection, stating that Smith could not "ask the doctor to be an expert witness against himself."

The jury returned a verdict in favor of Dr. Irving, and the circuit court entered final judgment in accordance with the jury verdict.  Smith appeals.

Smith argues that the circuit court abused its discretion in sustaining defense counsel's objection to questions about the standard of care posed by Smith's counsel on cross-examination. Smith asserts that Dr. Irving held himself out as an expert in general surgery and, therefore, was presumed to know the standard of care applicable to general surgeons practicing in Virginia.  Smith further contends that Dr. Irving gave expert opinion testimony on direct examination, thereby "opening the

door" for Smith to inquire into the same matters on cross-examination. Thus, Smith maintains, Dr. Irving was subject to cross-examination as an expert witness. We disagree with Smith's arguments.

The standard of review that we apply is well established. A court's decision regarding the admission or exclusion of evidence is discretionary in nature and, thus, will not be overturned on appeal unless the record shows an abuse of that discretion. Wright v. Kaye, 267 Va. 510, 517, 593 S.E.2d 307, 310 (2004); May v. Caruso, 264 Va. 358, 362, 568 S.E.2d 690, 692 (2002); John v. Im, 263 Va. 315, 320, 559 S.E.2d 694, 696 (2002).

Under "the American rule" applied in this Commonwealth, the cross-examination of a witness is limited to matters elicited on direct examination. Duncan v. Carson, 127 Va. 306, 318, 103 S.E. 665, 668 (1920); see Velocity Express Mid-Atl., Inc. v. Hugen, 266 Va. 188, 206, 585 S.E.2d 557, 567 (2003); 1 John W. Strong, McCormick on Evidence § 21 (5th ed. 1999). Therefore, if counsel's attempted cross-examination of a witness addresses matters exceeding the scope of direct examination, a court's refusal to allow this cross-examination will be approved on appeal as a proper exercise of the court's discretion. Russell v. Commonwealth, 261 Va. 617, 621, 544 S.E.2d 311, 313 (2001); Spruill v. Commonwealth, 221 Va. 475, 485, 271 S.E.2d 419, 425

6

(1980); see N. & W. Railway v. Chrisman, 219 Va. 184, 190, 247 S.E.2d 457, 460-61 (1978).

In this context, we consider whether Dr. Irving's testimony on direct examination addressed the standard of care applicable to a general surgeon in Virginia. The standard of care imposed on physicians and other health care providers in Virginia is defined as "that degree of skill and diligence practiced by a reasonably prudent practitioner in the [same] field of practice or specialty in this Commonwealth." Code § 8.01-581.20; see also Tashman, 263 Va. at 73, 556 S.E.2d at 777. A physician licensed in Virginia is presumed to know the statewide standard of care in the practice field or specialty in which he is qualified and certified. Code § 8.01-581.20; Wright, 267 Va. at 518, 593 S.E.2d at 311; Black v. Bladergroen, 258 Va. 438, 443, 521 S.E.2d 168, 170 (1999).

Our review of Dr. Irving's testimony on direct examination, as illustrated by the testimony set forth above, shows that Dr. Irving did not give expert testimony on the standard of care for general surgeons performing gastric bypass surgery and providing related postoperative care. Instead, Dr. Irving's direct testimony addressed factual issues in the case, including what actions he took and his reasons for taking those actions. His testimony regarding what "many surgeons . . . do" also was factual in nature and did not constitute expert testimony

7

concerning the standard of care applicable to his treatment of Michael Smith.

This factual testimony was materially different from standard of care testimony, which involves an expert opinion whether a physician's treatment of a patient demonstrated that degree of skill and diligence employed by a reasonably prudent practitioner in the same field of practice or specialty in Virginia. See 8.01-581.20; Tashman, 263 Va. at 73-74, 556 S.E.2d at 777; Raines v. Lutz, 231 Va. 110, 113, 341 S.E.2d 194, 196 (1986). Thus, we hold that because Dr. Irving's direct testimony did not address any standard of care issue relating to his treatment of Smith, the circuit court did not abuse its discretion in refusing to permit cross-examination on that subject. See Velocity Express, 266 Va. at 206, 585 S.E.2d at 567; Duncan, 127 Va. at 318, 103 S.E. at 668.

Our conclusion is not altered by the fact that Dr. Irving, as a licensed general surgeon in Virginia, was presumed to be familiar with the standard of care applicable to general surgeons in this Commonwealth. See Code § 8.01-581.20. In the absence of any testimony on direct examination by a defendant physician addressing the standard of care, that physician's presumed knowledge of the standard of care does not render him subject to cross-examination on that issue.

8

For these reasons, we will affirm the circuit court's judgment.

<u>Affirmed.</u>