Present:  Kinser, C.J., Lemons, Goodwyn, Millette, and Mims, JJ., and Russell and Koontz, S.JJ.

RIVERSIDE OWNER, L.L.C., ET AL.

v.    Record No. 100347

CITY OF RICHMOND

OPINION BY
JUSTICE LEROY F. MILLETTE, JR.
June 9, 2011

CITY OF RICHMOND

v.    Record No. 100703

RIVERSIDE OWNER, L.L.C., ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Jr., Judge

The City of Richmond's Tax Abatement for Rehabilitated Real Estate Program (Program) provides a partial exemption from real estate taxes for qualifying rehabilitated property. Richmond City Code§ 27-83(a).[1]  To qualify for a partial exemption, a property must increase in value by at least 40 percent because of rehabilitation no later than "December 31 of the third calendar year following the year in which [its owner's] application [for the Program] is submitted."  City Code § 27-83(b).  The amount of the partial exemption is the difference between the property's "base value" (assessed value

_____

[1] In 2004, the City revised the Program and recodified it in sections of Chapter 98 of the City Code.  Because these appeals concern the Program before its revision and recodification, we cite the sections of former Chapter 27.

1

before rehabilitation) and its "initial rehabilitated assessed value." City Code § 27-83(b)-(c), (g).

Since 1981, the City Assessor's office has determined a property's initial rehabilitated assessed value, not as of the date its rehabilitation is completed, but as of the date its owner's application for the Program is submitted. The principal question presented by these consolidated appeals is whether that policy is consistent with the requirements of City Code § 27-83 and its enabling statute, Code § 58.1-3221.

## I. BACKGROUND

In 2000, City officials and a delegation of business leaders met with representatives of The Cordish Companies, a real estate development company, to propose several sites along the City's historic Canal Walk for rehabilitation. After inspecting the proposed sites, Cordish selected a site located on Brown's Island, which consisted of two dilapidated power plants. It then formed Richmond Power Plant, LLC to rehabilitate the Brown's Island site.

After nearly two years of negotiations, the City and Richmond Power Plant entered into a development agreement (Agreement) in 2003. The Agreement called for the construction of, among other things, a mixed-use building with a parking garage (Property). In exchange for Richmond Power Plant's rehabilitation of the power plants, the City promised, among

2

other things, that "the [Property] shall qualify for the full benefit of the [Program]."

Richmond Power Plant applied for the Program in 2002. At that time, the City Assessor's office determined that the power plants each had a base value of $500. Construction on the Property began in 2003 and was completed two years later at a cost of approximately $63.8 million.

In August 2005, the Property was sold to Riverside Owner, L.L.C. for $85 million. One month later, the City Assessor's office conducted its final inspection of the Property and determined that, based on the cost of the rehabilitation, its office space had a value of $63.8 million. In May 2006, the City Assessor's office revised that amount to roughly $45.2 million for purposes of the Program. The difference in the two amounts was due to the application of the "Chandler policy."

In 1981, former City Assessor Richard A. Chandler established a new policy for determining a property's initial rehabilitated assessed value under the Program. Pursuant to the policy, he explained in an internal memorandum, "[t]he final estimate of value for rehabilitation credit will be determined as of the date of the application and computed only on the information which was available at the time the base value was established." The purpose of the policy, he further explained, was "to eliminate from the final estimate of value

3

any enhancement created by something other than rehabilitation or physical improvement."  The policy was not published in the Program's materials until 2006.

So, in accordance with the Chandler policy, the City Assessor's office took the value of the Property's office space as of 2005, when the rehabilitation was completed, and backdated it to 2002, when the Property's former owner, Richmond Power Plant, applied for the program.[2]  Because of this backdating, the value of the office space was reduced from $63.8 million to approximately $45.2 million for purposes of the Program.

When Riverside Owner received its 2006 real estate tax bill for the Property, it discovered that it had not been awarded a partial exemption under the Program.  The City later acknowledged that error and issued a revised tax bill that included a partial exemption based on the backdated value called for by the Chandler policy.  Disagreeing with that value, Riverside Owner paid the revised tax bill under protest and appealed to the City Assessor, challenging the Chandler policy.  The City Assessor denied the appeal, concluding that the Chandler policy was consistent with Code § 58.1-3221 and City Code § 27-83, and was therefore "correct and legal."

---

[2] To backdate a property's value for purposes of the Program, the City Assessor's office uses "an indexing factor" provided by Marshall & Swift, a cost estimation service.

4

In 2008, Riverside Owner and the Property's anchor tenant, Troutman Sanders LLP (collectively, Taxpayers), filed a "Complaint and Application for Relief from Erroneous Assessments of Taxes Upon Real Property" (Application), pursuant to Code § 58.1-3984. Among other things, they alleged that the Chandler policy was "ultra vires and an improper usurpation of legislative power by the City Assessor, and such policy [was] an improper methodology for setting the assessed value of rehabilitated improvements, and otherwise illegal." They sought a refund of the excess taxes that they paid because of the application of the Chandler policy, interest on the overpayments, and attorney's fees.

The circuit court, in accordance with Code § 58.1-3984, held a hearing on the Taxpayers' Application. Because the Taxpayers and the City agreed on the post-rehabilitation values of the Property's office and retail spaces if the Chandler policy were applied and if it were not, the sole issue before the circuit court was whether the policy was "not uniform in its application, or . . . otherwise invalid or illegal." Id. During the hearing, the Taxpayers presented the testimony of several witnesses, including Robert P. Englander, Jr., who, over the City's objection, was qualified as an "expert on real estate valuation and development and on the application of the [Program] to commercial and mixed use properties."

5

In a letter opinion, the circuit court held that the Chandler policy "depart[ed] from the requirement[s]" of Code § 58.1-3221 and City Code § 27-83, because it "relie[d] on values other than assessed ones" to determine the amount of the partial exemption "due to the [Taxpayers]."[3] Accordingly, the circuit court ruled in the Taxpayers' favor.

At a later hearing on the final order, the Taxpayers reminded the circuit court that it had not yet ruled on their claim for attorney's fees and asked that it do so. They argued that, as the prevailing party, they were entitled to attorney's fees under Section 9.5 of the Agreement. The circuit court disagreed, finding that the case was not brought pursuant to the Agreement. It then entered the final order, awarding the Taxpayers relief for both the Property's office and retail spaces for the tax years 2006 through 2008, in accordance with the post-rehabilitation values that the parties agreed on if the Chandler policy were not applied, but denying their claim for attorney's fees. These consolidated appeals followed.

II. DISCUSSION

A. The City's Appeal

---

[3] In its letter opinion, the circuit court states that the Chandler policy departs from the requirements of "the authorizing statute, Va. Code § 58.1-3984, and the ordinances enacted pursuant thereto." We assume this to be a typographical error, since Code § 58.1-3221 is the enabling statute for City Code § 27-83.

The City assigns four errors.  The first two concern the circuit court's decision not to apply the Chandler policy.  The third challenges the circuit court's decision to admit the testimony of the Taxpayers' expert, Englander.  The last involves the circuit court's decision to grant the Taxpayers relief for the Property's retail space.  We address each of these assignments of error in turn.

### 1. Chandler Policy

The City first contends that the circuit court erred in holding that the Chandler policy was inconsistent with Code § 58.1 3221 and City Code § 27-83.

Whether the Chandler policy comports with the requirements of Code § 58.1-3221 and City Code § 27-83 is a question of statutory interpretation.  As such, it " 'presents a pure question of law and is accordingly subject to de novo review by this Court.' "  Warrington v. Commonwealth, 280 Va. 365, 370, 699 S.E.2d 233, 235 (2010) (quoting Jones v. Commonwealth, 276 Va. 121, 124, 661 S.E.2d 412, 414 (2008)).

As with any question of statutory interpretation, our primary objective is " 'to ascertain and give effect to legislative intent,' " as expressed by the language used in the statute.  Commonwealth v. Amerson, 281 Va. 414, 418, 706 S.E.2d 879, ___ (2011) (quoting Conger v. Barrett, 280 Va. 627, 630, 702 S.E.2d 117, 118 (2010)).  " 'When the language of a statute

7

is unambiguous, we are bound by the plain meaning of that language.' " Ford Motor Co. v. Gordon, 281 Va. 543, 549, ___ S.E.2d ___, ___ (2011) (quoting Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007)).  Because the words of a statute are chosen with care, "we will not read a legislative enactment in a manner that renders any portion of that enactment useless." Antisdel v. Ashby, 279 Va. 42, 48, 688 S.E.2d 163, 166 (2010).  Rather, "we will apply an act of the legislature by giving reasonable effect to every word used."  Id.

With these principles in mind, we turn to the language of Code § 58.1-3221 and City Code § 27-83.  As relevant here, Code § 58.1-3221 provides:

> A. The governing body of any county, city or town may, by ordinance, provide for the partial exemption from taxation of real estate on which any structure or other improvement no less than twenty years of age, or fifteen years of age if the structure is located in an area designated as an enterprise zone by the Commonwealth, has undergone substantial rehabilitation . . . subject to such conditions as the ordinance may prescribe. . . .  The governing body of a county, city or town may establish criteria for determining whether real estate qualifies for the partial exemption authorized by this provision and may require the structure to be older than twenty years of age, or fifteen years of age if the structure is located in an area designated as an enterprise zone by the Commonwealth, or place such other restrictions and conditions on such property as may be prescribed by ordinance. . . .
>
> B. The partial exemption provided by the local governing body may not exceed an amount equal to the

8

increase in assessed value resulting from the rehabilitation . . . as determined by the commissioner of revenue or other local assessing officer.

City Code § 27-83, which was adopted pursuant to Code § 58.1-3221, in pertinent part, provides:

> (a) <u>Exemption authorized.</u>  Partial exemption from real estate taxes is provided for qualifying property rehabilitated . . . if eligible according to the terms of the Constitution, the Code of Virginia and the provisions of this section and Section 27-86.
>
> (b) <u>When deemed rehabilitated.</u>  For the purposes of this section, commercial or industrial real estate shall be deemed to be substantially rehabilitated when a structure . . . has been so improved by renovation, reconstruction or replacement as to increase the assessed value of the structure by no less than forty (40) percent. . . .  Upon receipt of an application for tax exemption, the Assessor shall determine the assessed value (hereafter referred to as base value) of the structure prior to commencement of rehabilitation.  Such assessment shall serve as a basis for determining whether the rehabilitation undertaken increases the assessed value of such structure by at least forty (40) percent.  The application to qualify for tax exemption shall be effective until December 31 of the third calendar year following the year in which [the] application is submitted. . . .  When it is determined that a forty-percent increase in assessed value . . . has occurred, the tax exemption shall become effective beginning on January 1 of the next calendar year.
>
> . . . .
>
> (g) <u>Commercial or industrial structures in enterprise zones.</u>  Commercial or industrial structures that are . . . qualified under this section shall be entitled to a fifteen-year period of exemption in the full amount of the difference in taxes computed upon the base value and the initial rehabilitated assessed value of the property for each year of the fifteen (15) years.

9

According to City Code § 27-83(g), the amount of a partial exemption awarded under the Program is to be determined based on the difference between a property's base value (assessed value before rehabilitation) and its initial rehabilitated assessed value. The City argues that "initial rehabilitated assessed value" does not mean the first assessed value after rehabilitation – or, in other words, the first value after rehabilitation that is determined by an appraiser for tax purposes. See Black's Law Dictionary 1691 (9th ed. 2009) (defining "assessed value" as "[t]he value of an asset as determined by an appraiser for tax purposes"); see also DKM Richmond Assocs. v. City of Richmond, 249 Va. 401, 408, 457 S.E.2d 76, 80 (1995) ("[T]he word 'assessment' in [the] context [of City Code § 27-83] refers to the determination of the value of the property as a result of an appraisal."). Instead, citing a parenthetical found in City Code § 27-86(b), the City contends that the phrase means the "value attributable to rehabilitation."

We disagree. As relevant here, City Code § 27-86(b) provides: "The Director of Finance . . . shall cause to be prepared a credit in an amount equal to the difference in taxes as computed upon the base value and the initial rehabilitated

10

assessed value (i.e., value attributable to rehabilitation)."[4] Contrary to the City's contention, the parenthetical in this section does not define "initial rehabilitated assessed value," but rather describes what remains when the base value is subtracted from the initial rehabilitated assessed value, which is then used to calculate the amount of the tax credit to which an owner is entitled under the Program. Accordingly, we read "initial rehabilitated assessed value" to mean what it says: the first assessed value after rehabilitation.

As noted earlier, the Chandler policy does not use the first assessed value after rehabilitation to determine the amount of a partial exemption. Instead, it uses a hypothetical value based on backdating, which is employed only for purposes of determining the amount of a partial exemption. The Chandler policy thus effectively reads the word "assessed" out of City Code § 27-83.

The City submits that the Chandler policy's departure from the language of City Code § 27-83 is permissible because Code § 58.1-3221(B) provides that "the increase in assessed value resulting from the rehabilitation" is to be determined by the "local assessing officer." We find this contention unpersuasive.

---

[4] The amount of the tax credit is the amount of the partial exemption multiplied by the City's tax rate.

11

Code § 58.1-3221(A) gives the City Council — and not the City Assessor – the authority to establish by ordinance the Program's "criteria." Among the criteria the City Council prescribed pursuant to that authority was the methodology for determining the amount of a partial exemption found in City Code § 27-83(g) – which, as described above, employs a property's first assessed value after rehabilitation. The City Assessor was thus obligated to follow that methodology, even if he believed that a different methodology using a hypothetical value based on backdating would better ensure that the amount of a partial exemption did not exceed "the increase in assessed value resulting from the rehabilitation." Code § 58.1-3221(B).

The City also contends that, if the Chandler policy is not applied, and the initial rehabilitated assessed value is determined as of the date the rehabilitation was completed, then the Taxpayers will receive a partial exemption that is greater than the increase in the Property's assessed value resulting from the rehabilitation, in violation of Code § 58.1-3221(B). That is so, it argues, because the partial exemption will include market appreciation.

While it is possible that determining a property's initial rehabilitated assessed value as of the date the rehabilitation is completed might give an owner a partial exemption that is greater than the increase in assessed value resulting from the

12

rehabilitation, there is no evidence of that in this case. Uncontroverted evidence established that the Property sold for $85 million one month before the City Assessor's office conducted its final inspection. Instead of using the amount of that contemporaneous sale to determine the Property's initial rehabilitated assessed value, the City Assessor's office chose to apply the cost approach to valuation, determining the Property's value in accordance with the cost of the rehabilitation — $63.8 million. The difference between the two amounts – almost $22 million – is, as argued by the Taxpayers, attributed to market appreciation. Thus, based on the evidence presented, the Property's initial rehabilitated assessed value was limited to the cost of the rehabilitation and did not include market appreciation.

In sum, we hold that the circuit court did not err in holding that the Chandler policy was inconsistent with City Code § 27-83, because that ordinance requires that a property's first assessed value after rehabilitation be used to determine the amount of a partial exemption. We further hold that the Taxpayers were not given a partial exemption that was greater than the increase in assessed value resulting from

13

rehabilitation, because the first assessed value after rehabilitation did not include market appreciation.[5]

## 2. Admission of Expert Testimony

The City next claims that the circuit court erred in admitting the testimony of Englander, the Taxpayers' expert on real estate valuation and the application of the Program to mixed-use properties.

"The admission of expert testimony is committed to the sound discretion of the trial judge, and we will reverse a trial court's decision only where that court has abused its discretion."  CNH America LLC v. Smith, 281 Va. 60, 66, 704 S.E.2d 372, 375 (2011) (quoting Tarmac Mid-Atlantic, Inc. v. Smiley Block Co., 250 Va. 161, 166, 458 S.E.2d 462, 465 (1995)).  Hence, when reviewing a circuit court's decision to admit expert testimony, we apply an abuse of discretion standard.  Id.

Englander worked as a tax assessor in Texas for 4 years and as a licensed real estate appraiser in both Texas and Virginia for another 14 years.  In 1995, he stopped working as an appraiser in order to become a real estate developer, and thus allowed his appraisal license to lapse.

_____

[5] In light of these holdings, we need not address the Taxpayers' assignment of cross-error regarding the City's alleged failure to give notice of the Chandler policy before the Agreement was executed.

14

As a developer, Englander rehabilitated numerous commercial and residential properties in Richmond. In so doing, he became familiar with the Program, applying for and receiving a partial exemption for 7 or 8 of the properties he rehabilitated. He was also appointed to a committee "charged with making recommendations to City Council as to any changes that should be made to the program, if any, and whether to sunset the program altogether." As a member of that committee, he heard presentations from several City departments, including the City Assessor's office, which provided him and the other committee members with an overview "as to what the program was and how it was impacting the City."

Englander testified that the City Assessor's office had not applied the Chandler policy uniformly. He explained that with most of the properties he reviewed, the City Assessor's office determined an initial rehabilitated assessed value that was within roughly 5 percent of the rehabilitation costs. But with the Property, he continued, it determined an initial rehabilitated assessed value that "originally was almost [a] 50 percent different[ial]" and that "is now down to about 20 percent."

The City contends that the circuit court erred in admitting Englander's testimony because it "was speculative, founded on assumptions that had no basis in fact, and/or failed

15

to consider all the variables that bore upon the inferences to be deduced from the facts observed." Moreover, the City argues, Englander was unqualified to offer an opinion on whether the City Assessor's office had applied the Chandler policy uniformly because he was no longer a licensed appraiser in Virginia, had no experience as an assessor in Virginia, and had not administered a tax abatement for rehabilitated real estate program in Virginia.

"Expert testimony," we have said, "is admissible in civil cases to assist the trier of fact, if the testimony meets certain fundamental requirements, including the requirement that it be based on an adequate factual foundation." Countryside Corp. v. Taylor, 263 Va. 549, 553, 561 S.E.2d 680, 682 (2002); see also Code §§ 8.01-401.1 and -401.3. Expert testimony is thus "inadmissible if it is speculative or founded on assumptions that have an insufficient factual basis." John v. Im, 263 Va. 315, 320, 559 S.E.2d 694, 696 (2002). Additionally, "expert testimony is inadmissible if the expert fails to consider all the variables that bear upon the inferences to be deduced from the facts observed." Vasquez v. Mabini, 269 Va. 155, 160, 606 S.E.2d 809, 811 (2005).

Assuming that the circuit court erred in admitting Englander's testimony, we conclude that the error was harmless. Recently, in another erroneous assessment case, we held that,

16

"to the extent the circuit court erred in admitting [an expert's] testimony into evidence, such error was harmless" because the testimony "could not have affected the result." County of Albemarle v. Keswick Club, L.P., 280 Va. 381, 390, 699 S.E.2d 491, 496 (2010).

So too here. As the City concedes, Englander's testimony was limited to whether the City Assessor's office had applied the Chandler policy uniformly. But the circuit court did not address, much less decide, that issue in ruling in the Taxpayers' favor. Rather, as discussed earlier, the basis for the circuit court's decision was that the Chandler policy was inconsistent with the requirements of Code § 58.1-3221 and City Code §§ 27-83, and that therefore the assessment on the Property was "otherwise invalid or illegal." Code § 58.1-3984(A). Thus, just as with the expert's testimony in Keswick Club, Englander's testimony "could not have affected the result." 280 Va. at 390, 699 S.E.2d at 496. Accordingly, to the extent that the circuit court erred in admitting it, the error was harmless.

### 3. Inclusion of the Property's Retail Space in the Final Order

Finally, the City contends that the circuit court erred in including the Property's retail space (Parcel No. 1138) in the final order because the Taxpayers allegedly failed to include

17

that space in the Application.  To support its argument, the City relies on our decision in <u>Potts v. Mathieson Alkali Works</u>, 165 Va. 196, 181 S.E. 521 (1935), in which we said:  "No court can base its decree upon facts not alleged, nor render its judgment upon a right, however meritorious, which has not been pleaded and claimed."  <u>Id.</u> at 207, 181 S.E. at 525.

What the City fails to mention, however, is that the circuit court made a factual finding that the retail space was at issue:

> [COUNSEL]:  Your honor, only thing I would say is that if you go back to [the Taxpayers'] Exhibit 42, [the City Assessor's] spreadsheet that memorialized the agreement [on values], there's one parcel number there, 1014 . . . . That's one of the two in our complaint.  That's for both spreadsheets, the office area and the retail area.  The evidence is clear that it has always been the office area and the retail area that was part of the agreement and at issue in this case.

> THE COURT:  Well, I'm in agreement with that.  I think it's the office area <u>and</u> the retail area that's indicated in the evidence and by the spreadsheet, and so that should be included in the order."

(Emphasis added.)

Factual findings of a trial court are entitled to the same weight as a jury verdict and will not be set aside unless they are plainly wrong or without evidence to support them.  Code § 8.01-680; <u>Transcontinental Ins. Co. v. RBMW, Inc.</u>, 262 Va. 502, 510, 551 S.E.2d 313, 317 (2001).  On the record before us, we cannot say that the circuit court's factual finding that the

18

retail space was at issue is plainly wrong or without evidence to support it.  In addition to Exhibit 42, uncontroverted testimony from Neil Kessler, a Troutman Sanders partner, established that the retail space was at issue and that it had been included in the parties' agreement on post-rehabilitation values.

We therefore hold that the circuit court did not err in including the retail space in the final order.

### B. The Taxpayers' Appeal

The Taxpayers assert that the circuit court erred in denying their claim for attorney's fees under Section 9.5 of the Agreement.  That section reads as follows:

> If either the City or Developer brings suit or other legal proceedings or arbitration proceeding to enforce the provisions of this Agreement against the other, then the party prevailing in such suit or proceeding shall be reimbursed by the other for all reasonable attorneys' fees and litigation and/or arbitration costs and expenses incurred by the prevailing party in connection with such suit or proceeding.

The Taxpayers argue that they are entitled to an award of attorney's fees under this section because they were the prevailing party in a "suit or other legal proceeding" to enforce the provisions of the Agreement — in particular, the provisions in which the City warranted that they would receive "the full benefit" of the Program.

19

We disagree. No doubt the Taxpayers make reference to the Agreement in the Application. But that does not mean that they brought this case under the Agreement. Indeed, in the very first paragraph of the Application, they say otherwise: "Pursuant to Va. Code § 58.1-3984, [the Taxpayers] apply to this Court for relief from the erroneous assessments of taxes by . . . the City." What is more, in another paragraph of the Application – which appears under the heading "Applicable Relief" – they say:

> This Court, pursuant to Virginia Code § 58.1-3984, is empowered to correct the City's erroneous assessments and to order a refund of the excess taxes paid by [the Taxpayers] as a result of such erroneous assessments. In addition, the Court, upon finding an overpayment of taxes in an action brought pursuant to Virginia Code § 58.1-3984, shall award interest on such overpayments, pursuant to Virginia Code § 58.1-3916, at the same rate of interest charged by the City on delinquent taxes.

It is not until the second-to-last line of the final paragraph of the Application that they make any mention of their claim for attorney's fees. And even there, they do not invoke Section 9.5 of the Agreement.

Simply put, this case was not brought and litigated as a breach of contract case but as an erroneous assessment case under Code § 58.1-3984. And it was so treated by the circuit court. In fact, there is no mention of the Agreement in either the letter opinion or the final order.

Accordingly, the Taxpayers are not entitled to an award of attorney's fees unless Code § 58.1-3984 so provides.  See Nusbaum v. Berlin, 273 Va. 385, 400, 641 S.E.2d 494, 501 (2007) ("[O]rdinarily, attorneys' fees are not recoverable by a prevailing litigant in the absence of a specific contractual or statutory provision to the contrary." (quoting Lannon v. Lee Conner Realty Corp., 238 Va. 590, 594, 385 S.E.2d 380, 383 (1989))).  Because it does not, we hold that the circuit court did not err in denying the Taxpayers' claim for attorney's fees.

### III. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the circuit court.

Affirmed.