PRESENT:  All the Justices

NAHID AZAD FROUZ

v.  Record No. 171450

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE CLEO E. POWELL
December 6, 2018

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Richard E. Gardiner, Judge

By summons issued pursuant to Code § 3.2-6540, Nahid Azad Frouz ("Frouz") was

ordered to respond to an allegation that she was the owner of a "dangerous dog."  After a bench

trial, the circuit court found that the dog was a "dangerous dog" within the meaning of Code

§ 3.2-6540(A),[1] that Frouz was the custodian or harborer of the dog, and ordered Frouz to pay

restitution for the injuries to a dog belonging to Kimberly Kern ("Kern").  Frouz appeals the

circuit court's judgment to this Court.

I.  BACKGROUND

A.  The Location

Frouz and her husband, Ali Aalai ("Aalai"), live on property abutting Belmont Bay in

Fairfax County.  Blue, their son Mohammad's pit bull, stayed in the home while Mohammad

studied for exams in New York.  Kern lives next door to Frouz and Aalai and owns three dogs:

Gunston, Mason, and Belmont.  Kern's property has a two-acre yard also abutting Belmont Bay

---

[1] After the summons was issued to Frouz, the General Assembly amended Code § 3.2-6540.  2017 Acts ch. 396.  As a result of the amendment, the language of subsection (A) was altered and subsection (B) was redesignated as subsection (C).  While the assignments of error are framed to refer to the current version of Code § 3.2-6540, we will refer to the version under which the summons was issued.  No substantive changes were made that affect the pertinent portions of the statute applicable here.

near the mouth of Massey Creek. Between the houses is a wooded area overgrown with bamboo, most of which belongs to Frouz and Aalai as their property line came up to the edge of the wooded area near Kern's boat ramp. This boat ramp is next to a dock at the edge of Kern's yard where it meets the shoreline of Belmont Bay.

Patricia Klein ("Klein") testified as follows at trial. On July 5, 2016, Klein and her boyfriend Dennis were visiting Kern. Klein, Dennis, and Kern's daughter Caroline launched two kayaks from Kern's boat ramp into Belmont Bay. Kern's three dogs were out in her yard when Klein, Caroline, and Dennis left in the kayaks. Gunston and Belmont stayed in Kern's yard, but Mason followed the kayaks along the shoreline past the wooded area and Frouz's yard. Klein and Dennis turned around to go back to the boat ramp in order to put Mason in a kennel. When they got close to shore, they saw Blue on the beach "walking back and forth." Klein testified that Blue and Mason were at the boat ramp while Gunston and Belmont were on the dock. Klein and Dennis paddled away from the boat ramp in the opposite direction from Frouz's house to see if Kern's dogs would return to Kern's house but Mason followed them. After a few moments, they returned to the boat ramp to find Blue still on the beach.

Klein and Dennis paddled back to Frouz's property to get someone to call Blue away. They saw a woman and a boy in Frouz's yard and called to them "to get their dog back." The woman called out to Blue but he did not react so the woman approached Blue, who was then "very close to the boat ramp." At that point, Blue and Mason stood very close to each other "in that kind of staring contest" until Caroline called Mason. When Mason turned to look at Caroline, Blue jumped on top of Mason on the boat ramp. Gunston got between the other two dogs and Blue started to bite Gunston's "neck and his throat and kind of trying to drag him away."

2

Klein identified a photograph of a beach area below the boat ramp where Blue dragged Gunston after biting him. The photograph showed that the line between Kern's property and Frouz's property was at the edge of the boat ramp. Kern testified that the boat ramp, dock and shed belong to her and her husband. On the day of the attack, Kern saw Blue on top of Gunston at the base of the boat ramp.

Frouz's brother, Masoud Azad Frouz ("Masoud"), testified he was staying with Frouz on the day of the attack and saw Kern's three dogs running up and down on the riverbank at the edge of Frouz's property.

Annick Panahi ("Panahi") testified that she was with her grandchild in Frouz's yard when she saw three dogs running behind the fence in the yard. She indicated that Gunston tried to dig under the fence and got its head inside Frouz's yard. She further testified that Blue fought Gunston, forcing him back, and then that she saw Gunston run toward the water. According to Panahi, the two dogs continued fighting "[b]y the water, by the beach" at the bottom of Frouz's yard.

### B. Ownership/Custodianship

During the course of the trial, evidence was presented regarding statements made by Frouz that bear on the issue as to whether she was an owner or custodian of Blue. Prior to the incident, Frouz had written to the neighbors to alert them to Blue's aggressive nature. After the incident, Frouz called Kern to advise her that "her dog [Blue] was fine . . . and that everybody needs to be more aware of their dogs." Although Kern testified she thought Frouz owned Blue, the evidence presented established that Frouz had written in an email that her son actually owned Blue.

Frouz also testified on direct examination that Mohammad owned Blue and that he had asked her husband, Aalai, to take care of Blue while he studied for exams. She denied ever taking care of Blue and maintained that only Aalai took care of Blue. In response to questions from the court, Panahi also testified that only Aalai fed and watered Blue. Regarding events after the attack, Frouz testified that she "called [Kern] back . . . because I could not get in touch with the animal control to go and save my dog." She also testified, "I called and asked her to give me any information about an animal control who could go and save my dog."

C. Evidence as to Damages

By stipulation, Frouz conceded that the testimony of the veterinarian, Dr. Lockhart, was not necessary, and the parties agreed "that serious physical injury, as determined by a licensed veterinarian, has occurred to . . . Kern's dog as a result of a bite of the Defendant's son's dog." The court ruled "there is nothing in the stipulation that indicates what the veterinary bills reflected" and sustained Frouz's objection to the introduction of the medical records as hearsay. The Commonwealth showed Kern the veterinary records and bills to refresh her memory. The court allowed Kern to testify that she paid the veterinarian $3,896.15. Kern testified that Gunston spent several hours in surgery the day of the attack, and that Gunston was in the veterinary hospital for "[a]t least a week." Kern also testified that there was a rupture of the surgical repairs a few days into Gunston's recovery, and that the veterinarian had repaired that as well.

Kern also testified in general as to Gunston's health. She testified that his "health is good and was good prior to this incident." She further testified that Gunston had no injuries to his neck or face prior to the incident, and that he did not sustain any injuries after the incident within the time he returned to the veterinarian for his follow up appointments.

Following closing arguments, the circuit court ruled that Blue was a dangerous dog that attacked and inflicted serious injury on Gunston. The court found that there was evidence that the attack "may have started" on Frouz's property, but further found "that the final element of the attack, which resulted in the serious injuries to which the parties have stipulated, took place on [Kern's] property. . . ." The circuit court went on to state that "while I said I believe [Panahi] was correct in saying that . . . the fight between the dogs may have started on the property of [Frouz's] family, it is clear to me that the Commonwealth has proven beyond a reasonable doubt that the actual attack, which resulted in the serious physical injury, took place on . . . Kern's property." The court also concluded that Frouz was "the custodian or the harborer" of Blue, finding that "the evidence is undisputed that she owns the house, has full ownership of the property with her husband." The circuit court ordered Frouz to pay restitution in the amount of $3,896.15 to Kern.

## II. ANALYSIS

### A. Jurisdiction

As a threshold matter, the Court directed the parties to address in their briefs whether the Court has appellate jurisdiction in this case. The parties both stated during oral argument that the matter is civil and jurisdiction lies with this Court, despite the language in the statute providing "[t]he procedure for appeal and trial shall be the same as provided by law for misdemeanors." Code § 3.2-6540(B). We agree.

The Court previously addressed the same statutory procedural phrase in *Commonwealth v. Rafferty*, 241 Va. 319 (1991). *Rafferty* involved Code § 18.2-268(V), now Code § 18.2-264.4, which addresses the appellate procedure to be followed when a person refuses to subject himself to the taking of a blood or breath sample pursuant to the implied consent law. Like Code § 3.2-

5

6540(B), that section provides that "[t]he procedure for appeal and trial . . . shall be the same as provided by law for misdemeanors." *Id.* at 322 (first alteration in original) (citation omitted); *see also* Code § 18.2-268.4(B). Addressing the import of that language, in *Rafferty* we held that unlawful refusal charges were "administrative and civil in nature." *Id.* at 323. In addressing which court had jurisdiction of that civil proceeding, we stated that although the Code section at issue "regulate[d] the *procedure* on appeal, Rafferty's *substantive* right of appeal [was] regulated by Code § 8.01-670, which authorizes an appeal to this Court by 'any person . . . aggrieved . . . [b]y a final judgment in any other civil case.' Thus, this Court has jurisdiction." *Id.* at 323-24. Applying our rationale in *Rafferty*, an appeal under Code § 3.2-6540(B) is civil in nature and, by operation of Code § 8.01-670, this Court has appellate jurisdiction.[2]

## B. Code § 3.2-6540

Frouz argues that the circuit court erred in finding that Blue was a dangerous dog under Code § 3.2-6540(A) and that she was liable for restitution to Kern as Blue's custodian under Code § 3.2-6540(B). As pertinent to this appeal, Code § 3.2-6540(A) provides, in part:

> "Dangerous dog" means a canine or canine crossbreed that has bitten, attacked, or inflicted injury on . . . a companion animal that is a dog or cat or killed a companion animal that is a dog or cat. When a dog attacks or bites a companion animal that is a dog or cat, the attacking or biting dog shall not be deemed dangerous . . . (iii) if such attack occurs on the property of the attacking or biting dog's owner or custodian. . . .

Code § 3.2-6540(B) provides, in pertinent part, that "[t]he court, upon finding the animal to be a dangerous dog, may order the owner, custodian, or harborer thereof to pay restitution for actual

---

[2] Our jurisdictional determination is limited to those appeals only under former subsection (B) of Code § 3.2-6540, now Code § 3.2-6540(C). Former subsections (J) and (K) of Code § 3.2-6540 (now subsections (L) and (M)) set forth criminal violations and are subject to the appellate jurisdiction of the Court of Appeals.

6

damages to any person injured by the animal or whose companion animal was injured or killed by the animal."

## 1. Standard of Review

> Under well-established principles, an issue of statutory interpretation is a pure question of law which we review de novo. When the language of a statute is unambiguous, we are bound by the plain meaning of that language. Furthermore, we must give effect to the legislature's intention as expressed by the language used unless a literal interpretation of the language would result in a manifest absurdity. If a statute is subject to more than one interpretation, we must apply the interpretation that will carry out the legislative intent behind the statute.

*Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007) (citations omitted). "Factual findings of a trial court are entitled to the same weight as a jury verdict and will not be set aside unless they are plainly wrong or without evidence to support them." *Riverside Owner, L.L.C. v. City of Richmond*, 282 Va. 62, 75 (2011). "[W]e view the evidence and all reasonable inferences drawn from it in the light most favorable to [the Commonwealth], as the prevailing party at trial." *Palmer v. R.A. Yancey Lumber Corp.*, 294 Va. 140, 159 (2017).

## 2. Dangerous Dog Finding

Frouz argues that the circuit court erred in finding that Blue was a dangerous dog under Code § 3.2-6540(A) because the court stated that the attack took place on Frouz's property, thus she should be subject to the safe harbor contained in Code § 3.2-6540(A)(iii). The Commonwealth responds that the circuit court did not err because it found that the attack, which resulted in serious physical injury, took place on Kern's property.

Code § 3.2-6540(A)(iii) provides a defense to a dangerous dog finding if the "attack occurred on the property of the attacking or biting dog's owner or custodian." Frouz would have us define "occur" as "initiate" as she argues that "initiate" is included within the definition of "occur." However, in making the argument, she also argues that "occur includes both where the

attack starts and where it ends and everything in between." Occur is defined as "to be present or met with" and "to present itself, come to pass, take place." Webster's Third New International Dictionary 1561 (1993). The words of the statute are "unambiguous" and "we are bound by [their] plain meaning." *Conyers*, 273 Va. at 104. The definition of "occurs" as used in the statute is, therefore, not limited to the place where the attack initiated. Rather, as Frouz admits, the attack "occurs" at every location where it takes place. If the attack is confined to the dog's property, the safe harbor in Code § 3.2-6540(A)(iii) applies. However, once it extends beyond the owner or custodian's property, the safe harbor no longer applies.

Here, the circuit court found that the attack on Gunston took place on both properties. The circuit court stated that "based on [Panahi's] testimony, the attack was initiated on [Frouz's] property, but I will find that the final element of the attack, which resulted in the serious injuries to which the parties have stipulated, took place on the [Kern's] property. . . ." The court went on to find that "the fight between the dogs may have started on the property of [Frouz's] family, it is clear to me that the Commonwealth has proven beyond a reasonable doubt that the actual attack, which resulted in the serious physical injury, took place on . . . Kern's property." There was ample evidence in the record to support this finding. Accordingly, the circuit court did not err in finding that the attack occurred on Kern's property and determining that Blue was a dangerous dog and was not subject to the exception in Code § 3.2-6540(A)(iii).

### 3. Custodian

Frouz also argues that the circuit court erred in finding that she was a custodian or harborer of Blue and thus was liable for the amount of restitution owed to Kern. The circuit court found that the Commonwealth's evidence was sufficient to prove that she was the custodian or harborer of Blue.

8

Code § 3.2-6540(B) provides, in pertinent part, that "[t]he court, upon finding the animal to be a dangerous dog, may order the owner, custodian, or harborer thereof to pay restitution for actual damages to any person injured by the animal or whose companion animal was injured or killed by the animal." Custodian is defined as "one that guards and protects or maintains" and harbor is defined as "to give shelter or refuge to." Webster's Third New International Dictionary 559, 1031 (1993). Here, the circuit court held that "the evidence is undisputed that [Frouz] owns the house, has full ownership of the property with her husband, pursuant to the deed, which is admitted into evidence, that she is within the meaning of the statute, a custodian and/or harborer, and therefore, she has responsibility to pay the restitution." In addition to the reason articulated by the trial court, the evidence also showed that Frouz sent emails to neighbors regarding Blue's attitude toward other dogs. These communications could be viewed as an attempt to guard, protect, and/or maintain Blue. Frouz also referred to Blue as "my dog" after the attack and during her testimony. While perhaps not sufficient to demonstrate ownership in light of the undisputed evidence that Blue belonged to her son, one could certainly interpret these statements indicating that she provided shelter or refuge to Blue. Based on the evidence presented to the circuit court, the determination that Frouz was the custodian or harborer of Blue was not plainly wrong or without evidence to support it. Code § 8.01-680.

### 4. Restitution

Finally, Frouz asserts that the circuit court erred in ordering her to pay Kern $3,896.15 in restitution under Code § 3.2-6540(B). Frouz argues that the veterinary bills for Gunston were not admitted into evidence and there was no testimony as to whether the bills were for some other ailment or service needed to care for Gunston.

9

Code § 3.2-6540(B) allows the circuit court, in its discretion, to "order the owner, custodian, or harborer" of the dangerous dog "to pay restitution for actual damages to any person . . . whose companion animal was injured." Here, the Commonwealth presented sufficient evidence to support an award of restitution. Kern reviewed the veterinary bills to refresh her memory and testified that she paid $3,896.15. Kern was allowed to testify, without objection, that Gunston spent several hours in surgery on the day of the attack. A few days later he suffered a rupture that needed to be repaired. He was in the hospital for at least a week and had several follow-up visits with the veterinarian. Kern identified several pictures of Gunston showing the wounds inflicted by Blue. The evidence showed that Gunston was in good health prior to the attack and that he suffered no additional injuries from any other source after the attack. The parties also stipulated "that serious physical injury, as determined by a licensed veterinarian, has occurred to . . . Kern's dog as a result of a bite of [Frouz's] son's dog." Based on this evidence, the circuit court did not abuse its discretion in ordering restitution in the amount of $3,896.15.

### III. CONCLUSION

For the foregoing reasons we hold that appellate jurisdiction in a proceeding such as this lies with this Court. We further hold that the evidence was sufficient for the circuit court to find that Blue was a dangerous dog within the definition of Code § 3.2-6540(A), that Frouz was the custodian or harborer of Blue, and that Frouz owed restitution to Kern in the amount of $3,896.15.

*Affirmed*.