COURT OF APPEALS OF VIRGINIA


Present:   Judges Annunziata, Humphreys and McClanahan
Argued at Richmond, Virginia


RUSSELL ADAM PELLETIER

OPINION BY
v.        Record No. 3016-02-2         JUDGE ROSEMARIE ANNUNZIATA
FEBRUARY 10, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUISA COUNTY
John R. Cullen, Judge

J. Lloyd Snook, III (Snook & Haughey, on briefs), for appellant.

Richard B. Smith, Senior Assistant Attorney General (Jerry W.
Kilgore, Attorney General, on brief), for appellee.


Russell Adam Pelletier appeals his conviction of rape in violation of Code § 18.2-61;

capital murder during the commission of, or subsequent to, rape in violation of Code § 18.2-31;

using a firearm during the commission of murder in violation of Code § 18.2-53.1; and

possessing a firearm after having been a convicted of a felony in violation of Code § 18.2-308.2.

He contends the trial court erred by:  1) allowing dog trailing evidence in the case; 2) allowing

experts to testify that their trailing dogs can determine the age of the trail and the direction of

travel of the subject being trailed; 3) allowing expert opinion testimony when the expert cannot

explain the scientific basis for the opinion; and 4) ruling inadmissible on grounds of hearsay

testimony regarding the victim's consensual sexual relations with the defendant and her fiancé.

For the reasons that follow, we affirm his conviction.

I.  Background

On appeal, we review the evidence and all reasonable inferences that may be drawn in the

light most favorable to the Commonwealth as the party prevailing below.  Commonwealth v.

Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). So viewed, the record shows that Aimee Marie Meadows, a twenty-three-year-old woman residing in Louisa County with her parents, was raped and murdered on November 12, 2000. Russell Adam Pelletier was charged and convicted of rape in violation of Code § 18.2-61; capital murder during the commission of, or subsequent to, rape in violation of Code § 18.2-31; using a firearm during the commission of murder in violation of Code § 18.2-53.1; and possessing a firearm after having been convicted of a felony in violation of Code § 18.2-308.2. The jury fixed his sentence at life in prison for capital murder and rape, and 3 years for illegal use of a firearm. The trial court entered final judgment consistent with the jury's verdict on November 4, 2002, and also sentenced appellant to 2 years for illegal possession of a firearm. This appeal followed.

Pelletier and Meadows both resided in Blue Ridge Shores, a subdivision located in Louisa County. Meadows left the family home to walk the dog after supper on November 12, 2000. She did not return. Her father, increasingly concerned about his daughter's welfare, began calling for her and the dog about 8:00 p.m. The dog returned alone about two hours later. An extensive search of the area proved unsuccessful. At 11:24 p.m., Meadows's father notified the police that his daughter was missing.

Officer MacKay had been notified at 8:05 p.m. of a "domestic situation" at the Pelletier residence involving Pelletier and his mother. MacKay began looking for both Meadows and Pelletier, but found neither.

Meadows's body was ultimately discovered around noon on November 13, 2000 by a Blue Ridge Shores resident. Her body was floating about twelve to fifteen feet from a point of land which extends into a lake. A wound to the back of her head, two inches behind the left ear and below the earlobe, was observed.

At trial, Penny Radecker testified that she heard a gunshot about a half-hour or hour after she started using her computer at 10:00 p.m. the night Meadows failed to return home. Radecker's house is a two-minute walk from the beach area where Meadows's body was found.

Shawn Lamb, a friend of Pelletier, received a telephone call from Pelletier between 10:30 and 11:00 on the same night. Pelletier told Lamb he had shot and killed a girl and threw her body into the lake. Lamb did not know Meadows and initially gave little credence to Pelletier's account. When he heard media reports about the killing, he contacted police and agreed to cooperate with their investigation by wearing a "wire" when he visited Pelletier's home on November 16, 2000. Pelletier told him that he met a "girl" walking and that he "started slapping her around, took her by the woods, told her to take her clothes off and . . . to shake that ass." He said that, after the rape, they "went down to this boat," which he rowed to the middle of the lake. He asked Meadows if she intended to tell her parents about the rape. He then told her to look at him, put a gun against her head, and shot her. He described the shot as "close" to the victim, such that it "kind of like splattered." Pelletier also told Lamb that "it was too much to row back so he threw [the victim] over into the lake." When he got back to the "bank or dock," Pelletier said he sank the boat.

Andrew Lettner, another friend of Pelletier, was present when Pelletier talked to Lamb. He heard Pelletier state that, after he "had sex" with Meadows, "they went to the beach," got "in a boat and the girl ended up dead." Lettner testified that Pelletier said that he had pulled the gun on her, told her to undress, made her bend over, and raped her. After telling "the girl" to put her clothes back on, he forced her to walk to the beach and "made her get into the boat." After she stated her intention to tell her father about the rape, Pelletier "grabbed her by the back of the head and shot her once." Lettner also testified that Pelletier said he threw "the girl's" body in the water, rowed back to the shore, wiped his fingerprints off, and walked home.

While in jail, Pelletier wrote a letter to Lettner, which was introduced into evidence, asking Lettner to lie about what happened and explaining the approach he wanted Lettner to take:

> We were chilling [at Pelletier's house] drinking. After a while we saw Amy [sic] walking her dog up the street. I called her over to us. The dog left. I asked her if I could fuck. She said OK. So I fucked it, while you keep drinking. . . . Any side question they ask say I don't know I was drunk. When I finished fucking, Amy [sic] asked for some beer. . . . She left about *7:30*. If they ask how we know, you had a watch on. We chilled and drank till 8:30. You made a phone call for a ride. About 9:00 you left and went home or wherever. I'm fine after that. You got to memorize this shit. I need you bad on this. . . . I walk away from this two ways! A dead man or a rich man. I wanna be rich! When this is in your head till it hurts, *burn this letter*!

Dr. William Gormley, Assistant Chief Medical Examiner to the Chief Medical Examiner's Office in Richmond, Virginia, testified at trial and concluded that Meadows's death was caused by a gunshot wound with a bullet passing through the brain. Other studies were also conducted by Dr. Gormley, and blood and vaginal swabs were collected.

James Pickelman testified as an expert in firearms identification. He reported the results of his examination of the bullet taken from Meadows's body and its comparison with a bullet found in the ceiling of Pelletier's bedroom. Both bullets came from a .38 caliber weapon, which could include a .357 caliber weapon, and both had five lands and grooves which twisted to the right. Pickelman concluded that bullets were similar and the possibility that both had been fired from the same weapon could not be eliminated.

Lisa Shiermier, an expert in DNA analysis, testified that Pelletier's genetic material was present on vaginal swabs and on the wrist area of the left sleeve of a shirt recovered from the floor next to the foot of Pelletier's bed. The stain was a mixture of blood and another fluid. A hair found wrapped on the brace that held the fire extinguisher inside a boat found on the other

side of the lake was determined to be consistent with Meadows's DNA profile. The owner testified that, to his knowledge, Meadows had never been in his boat.

The Commonwealth also successfully admitted dog trailing evidence by calling two additional expert witnesses, Detective Stuart L. Garner and Sgt. Patrick Sheridan. In this case, Garner used a dog named Ranger, and Sheridan used a dog named Annie. Before Garner and Sheridan were allowed to testify, however, the trial court held a hearing to determine the admissibility of the dog trailing evidence.[1] That hearing established that Garner had been a bloodhound handler for eighteen years, during which time he had "worked well over a thousand (1,000) actual cases." Garner is a member of the "National Police Bloodhound Association, which is recognized as the foremost authority on bloodhounds within the United States" and "was co-founder of the Virginia Bloodhounds Search and Rescue Association." He is an instructor in the ICAST Association, "a group of handlers and instructors that travel to foreign countries to assist in the training of bloodhounds." Garner attends at least two training seminars a year, and had been an instructor at four to six one-week seminars during each of the two years that preceded this case. He stated that he "worked bloodhounds" in over 50 Virginia jurisdictions and that his dogs have been "recognized as credible witnesses within the court systems of Fluvanna County and Louisa County."

Garner addressed the process underlying the dog's ability to follow a trail. He explained that bloodhounds are able to discriminate among the individual scents of different persons. He explained that humans cast off skin cells at the rate of 50,000 to 60,000 per minute. These skin cells are decomposed by naturally occurring bacteria, and the bacteria emit gaseous byproducts which can be detected by the hound. The scent produced by the decomposition of each person's

---

[1] The Commonwealth and Pelletier agreed that Garner would provide testimony regarding the overall theory of dog trailing, but that Garner and Sheridan would testify separately as to what each dog discovered.

skin cells is distinct to that individual because each person ingests different kinds of food products and uses different kinds and amounts of soap and toiletries. The animal discriminates among all other scents present and has been trained to follow the scent of a particular individual once exposed to that person's scent. If the particular scent is not present at the scene, the dog has been trained to signify the absence of the scent by not "working" or "trailing" and by pulling on the harness and rope.

Garner further testified that during his dog's training, Ranger would consistently follow a trail in the direction in which it was made. Despite efforts by Garner to force Ranger to trail in the wrong direction, Garner stated that Ranger always traveled in the same direction that the test subject had traveled. He expressed confidence in his dog's abilities, stating:

> [T]hrough . . . trial and error and setting up and composing trails and constantly challenging that dog's abilities, setting up different sequences, different trails, different links, different ages and also having as a young dog, being able to observe my runner walk from Point A to Point B, in my mind I already know which way the runner has gone. This is for training exercises and that dog consistently will go the correct direction. . . . [T]hrough my records, I can show that.

He also testified that Ranger would always track the most recent or "hottest" scent.

Based on the foundation provided by Garner, the trial court found each expert to be qualified to give opinion evidence on matters involving dog handling, training, and the interpretation of the dog's behavior when trailing a particular scent.

Garner and his dog, Ranger, trailed Pelletier on November 15, 2000, beginning from the point on the beach where Meadows's body was recovered from the lake. The bloodhound was alerted to the scent by a towel collected from Pelletier's home. Garner interpreted Ranger's body language as signifying the presence of Pelletier's scent at that location. The trail led from the beach, to the clubhouse, out to the main street, South Lakeshore Drive, into a yard, and back to

the roadway. Ranger followed the scent to the door of Pelletier's residence, where the dog indicated the trail ended.

Garner and Ranger also trailed Meadows's scent, starting at the front door of her residence and proceeding to the beach, passing by the clubhouse, and then proceeding west past some boat docks and another large building. The trail led into a wooded area along a path to a bluff, then to flat ground and the water's edge. Garner described an area of "pool scent"[2] at this location and testified that the dog's body language indicated that "something had happened here." Ranger eventually left the "pool scent" area and trailed along the water's edge ending on the point of land nearest the place where Meadows's body was recovered. Garner opined that Meadows had either left the pool scent area and entered the water, or had actually been on the point of land. He conceded, however, that the scent Ranger detected on the point of land could have drifted there from a location on, or in, the water. Sheridan and his bloodhound, Annie, also trailed Meadows and Pelletier and obtained similar results.

Garner also testified that the age of the trail his dog followed in this case ranged from sixty-one to sixty-four hours old. He explained that he relied on other evidence that indicated the age of the trail and then observed the dog's responses on the trail to determine if they corroborated the known data establishing the trail's age. Sheridan did not offer an opinion on the age of the trail or on the possible direction of travel.

In the defense's case-in-chief, Pelletier called Michael Taylor, a friend of Meadows. But for a sustained hearsay objection, Taylor would have testified that Meadows told him that she and Pelletier had been having consensual sexual relations for over two months. Taylor also would have testified that Meadows told him that she had been having sex with her fiancé, Steve

_____

[2] Garner described "pool scent" as a large amount of scent.

Piatt, unbeknownst to her father, Darrell Meadows, who denied knowledge of any of Meadows's sexual encounters.

Pelletier also testified in his own defense. He claimed he had engaged in consensual sex with Meadows in the woods near his home. He said they were interrupted and that she left after he gave her some beer. He denied talking by telephone to Lamb on November 12, but admitted he told Lamb that he had raped and killed Meadows, explained he was "just messing with him." Pelletier also claimed Lamb brought a gun into his house and fired into the ceiling. Lamb denied doing so and denied owning a gun. Pelletier also admitted asking Lettner to lie for him, but claimed he could not remember making most of the other statements Lettner attributed to him. He admitted he told Lettner that he ordered Meadows to "shake ass and everything" and that he had "shot her in the head or something."

Pelletier challenges his convictions, claiming that the trial court improperly allowed the dog trailing evidence as set forth above and improperly excluded exculpatory hearsay testimony. Finding no error, we affirm.

## II. Analysis

### A. Admissibility of Expert Opinion Regarding Dog-Trailing Evidence

Pelletier contends that the Commonwealth failed to lay a proper foundation for the admission of Garner's expert testimony. Specifically, he complains that the Commonwealth did not establish the reliability of dog-trailing methods because Garner could not scientifically explain the dog's ability to discern the age of the trail and the direction in which the suspect traveled. Pelletier also argues that evidence of the route the dogs followed should not have been allowed because the dogs did not begin trailing at a place where other evidence proved Pelletier had been, as required by Epperly v. Commonwealth, 224 Va. 214, 294 S.E.2d 882 (1982). We find that Pelletier's contentions are without merit.

"It is well settled in Virginia that the opinion of an expert witness is admissible 'where the jury . . . is confronted with issues' that 'cannot be determined intelligently merely from the deductions made and inferences drawn on the basis of ordinary knowledge, common sense, and practical experience.'" Schooler v. Commonwealth, 14 Va. App. 418, 420, 417 S.E.2d 110, 111 (1992) (quoting Compton v. Commonwealth, 219 Va. 716, 726, 250 S.E.2d 749, 755-56 (1979)). An "'expert's testimony is admissible not only when scientific knowledge is required, but when experience and observation in a special calling give the expert knowledge of a subject beyond . . . common intelligence and ordinary experience.'" Hetmeyer v. Commonwealth, 19 Va. App. 103, 108, 448 S.E.2d 894, 898 (1994) (quoting Hubbard v. Commonwealth, 12 Va. App. 250, 254, 403 S.E.2d 708, 710 (1991), aff'd, 243 Va. 1, 413 S.E.2d 875 (1992)).

It is equally "well established that the admissibility of expert testimony is within the sound discretion of the trial court, and that court's decision will not be disturbed absent an abuse of discretion." Patterson v. Commonwealth, 3 Va. App. 1, 11, 348 S.E.2d 285, 291 (1986); see also Toro v. City of Norfolk, 14 Va. App. 244, 252, 416 S.E.2d 29, 33 (1992). A challenge to an "expert's . . . methods and determinations . . . , even by other experts, does not render inadmissible expert opinion based on those . . . methods and computations" but goes to the "weight of the evidence," raising "factual questions to be determined by the jury." Hubbard, 12 Va. App. at 255, 403 S.E.2d at 710.

The Virginia Supreme Court has permitted expert testimony regarding dog tracking evidence when a proper foundation has been laid.

> We hold that dog-tracking evidence is admissible in a criminal case after a proper foundation has been laid to show that the handler was qualified to work with the dog and to interpret its responses, that the dog was sufficiently trained and proven tracker of human scent, that the dog was placed on the trail where circumstances indicated that the guilty party had been, and that the

> trail had not become so stale or contaminated as to be beyond the dog's tracking capabilities.

Epperly, 224 Va. at 233, 294 S.E.2d at 893.

Epperly does not hold that dog tracking evidence must be explained scientifically before it can be admitted. Nevertheless, Pelletier contends that all expert testimony, whether it involves a scientific field, such as DNA analysis, or a highly specialized one, such as dog trailing or tracking, must be preceded by adequate scientific explanation that establishes its reliability. The courts of the Commonwealth, however, routinely allow expert testimony without a scientific foundation where "'the jury . . . is confronted with issues' that 'cannot be determined intelligently merely from the deductions made and inferences drawn on the basis of ordinary knowledge, common sense, and practical experience.'" Schooler, 14 Va. App. at 420, 417 S.E.2d at 111 (quoting Compton, 219 Va. at 726, 250 S.E.2d at 755-56.). An "'expert's testimony is admissible *not only when* scientific knowledge is required, but when *experience and observation* in a special calling give the expert knowledge of a subject beyond . . . common intelligence and ordinary experience.'" Hubbard, 12 Va. App. at 254, 403 S.E.2d at 710 (quoting Neblett, Adm'r v. Hunter, 207 Va. 335, 339-40, 150 S.E.2d 115, 118 (1966)) (emphasis added). For example, in criminal prosecutions for possession of drugs with the intent to distribute, the element of "intent to distribute" must often be proved by expert testimony regarding the quantity of drugs discovered. "'Expert testimony, usually that of a police officer familiar with narcotics, is routinely offered to prove the significance of the weight and packaging of drugs regarding whether it is for personal use.'" Askew v. Commonwealth, 40 Va. App. 104, 109, 578 S.E.2d 58, 61 (2003) (quoting Shackleford v. Commonwealth, 32 Va. App. 307, 327, 528 S.E.2d 123, 133 (2000)). The typical police officer qualifies as an expert based on his experience with narcotics, not on his ability to explain the scientific theory behind his opinion. An opinion regarding whether a certain quantity of drugs is inconsistent with personal use is not, in fact,

- 10 -

susceptible of "scientific" explanation as we traditionally understand the term. It is an opinion derived wholly from experience. Likewise, a clear majority of states allows dog tracking evidence despite the fact that the dog's ability cannot be scientifically explained.

> Many courts have ruled that . . . evidence of tracking a defendant is admissible, subject to establishment of a proper foundation. Even though the precise scientific basis for dog tracking remains uncertain, it is clear that such dogs can be trained to almost unerringly follow a trail left by particular persons even after some time has passed, and even though the trail has crossed the scent left by other persons.

Jay M. Zitter, Annotation, Evidence of Trailing by Dogs in Criminal Cases, 81 A.L.R.5th 563 (2003).

Epperly does not require that a scientific foundation be laid for the admission of dog trailing evidence. Rather, it holds that dog trailing evidence must be empirically shown to be reliable from experience. The showing of reliability is met by testimony from the handler establishing that he "was qualified to work with the dog and to interpret its responses" and that "the dog was a sufficiently trained and proven tracker of human scent." Epperly, 224 Va. at 233, 294 S.E.2d at 893. Pelletier, in fact, concedes in his opening brief that dog trailing evidence can be admitted "if it can be shown that, even though we don't know how or why, there is overwhelming empirical evidence that the dog has the ability to do what is claimed."

Here, the Commonwealth met the foundational requirements for dog trailing evidence established in Epperly, and Garner's opinion on the direction of travel and the age of the trail was properly allowed. Garner testified that he had tested Ranger's ability to discern the direction of travel. In training Ranger, Garner used a runner to go from point A to point B. After alerting Ranger to the runner's scent, Garner took the dog to a point along the trail. Garner tried to force Ranger to go in a direction opposite to the direction the runner had taken, but "[i]nvariably . . . he would turn and seek the freshest, hottest scent, thus going [along the path of the runner] from

A to B." Garner could not explain the scientific principles underlying Ranger's ability, opining only that it must be "God-given instinct." Garner, however, was not required to establish the scientific basis of a trailing dog's ability to follow scent in order for his opinion to be admitted. His testimony proved that Ranger was "sufficiently trained," that Garner "was qualified to work with the dog and to interpret its responses," and that the responses had proved reliable in numerous other cases. This empirical evidence was sufficient to establish the reliability and, therefore, the admissibility of Garner's opinion. See Hetmeyer, 19 Va. App. at 110, 448 S.E.2d at 898 (holding that "[e]vidence regarding the trailing dog's certification, recertification, training regime, and near-perfect past performance was clearly sufficient to demonstrate the dog's high degree of reliability").

Pelletier also challenges Garner's opinion regarding the age of the trail, contending it was nothing more than "post-hoc rationalization."[3] Pelletier misapprehends the nature and scope of Garner's testimony. Garner frankly explained that his opinion regarding the age of the trail did not rest solely on his dog's trailing efforts. Instead, he relied on other evidence signifying the age of the trail and then observed the dog's responses on the trail to determine if they corroborated the known data on trail age. Garner, furthermore, explained that his opinion was based on the experience he gathered by investigating thousands of trails of various ages and comparing the known age of the trails with several empirical factors, such as the speed the dog traveled on the trail and the tension on his lead. As noted above, the admissibility of expert opinion may be established by empirically-derived knowledge. See Epperly, 224 Va. at 233, 294 S.E.2d at 893; Hetmeyer, 19 Va. App. at 110, 448 S.E.2d at 898. Consistent with the

_____

[3] Pelletier further argues that *all* of the dog trailing evidence should have been excluded because it constituted nothing more than "post-hoc rationalization." However, Pelletier cites no authority in support of this argument. Accordingly, we decline to address it. Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992).

- 12 -

methodology he outlined, Garner acknowledged he was aware of other evidence establishing the trail's age and that his opinion was based both on that evidence and the reactions of the dog that corroborated it. He never testified that his opinion regarding the trail's age was based solely on the reactions of the trailing dog as explained by his interpretations of those reactions. We find that the requisite foundation admitting evidence of trail age was laid and that Pelletier's objection to Garner's opinion on the age of the trail goes only to the weight of his testimony, not to its admissibility. Tarmac Mid-Atlantic v. Smiley Block Co., 250 Va. 161, 167, 458 S.E.2d 462, 466 (1995); see also Epperly, 224 Va. at 233, 294 S.E.2d at 893. We do not evaluate the weight of evidence on appeal; that function resides with the trier of fact. See Tarmac, 250 Va. at 167, 458 S.E.2d at 466.

Finally, Pelletier contends that the Commonwealth failed to prove the Epperly requirement that the dog was placed on the trail where other evidence establishes the defendant had been. See Epperly, 224 Va. at 233, 294 S.E.2d at 893. To be sure, Garner and his dog began trailing Pelletier on the beach, and Garner conceded he could not be certain that Pelletier had been there. He opined that the scent that Ranger picked up may have drifted from the water onto the pier rather than originating there. However, Epperly does not require definitive proof of the defendant's presence at a particular place on the trail. Where the evidence establishes a nexus with the defendant's location and the commission of the crime under investigation, the mandate of Epperly has been met. Here, evidence, both direct and circumstantial, establishes that Pelletier admitted that he raped and killed the victim and then returned to the beach or the dock and that the victim's body was located in proximity to the point of land where the trailing began. Furthermore, Lettner testified that Pelletier said he "went to the beach" after the rape, and Lamb testified that Pelletier disposed of Meadows's body in the lake. We find the evidence connecting

- 13 -

Pelletier with the trail that Garner and his dog followed was sufficient to meet the Epperly requirement.

### B. Admissibility of Hearsay Testimony

Pelletier also contends that the Court erred in prohibiting Taylor's testimony regarding the victim's statements of her sexual relationship with Pelletier and Piatt. Pelletier contends Taylor would have testified that, two days before her death, Aimee Meadows told him that she and Pelletier were having consensual sexual relations. Pelletier also asserts Taylor would have testified that she told him that "she would sneak downstairs to have sex with . . . Piatt when Mr. Piatt spent the weekend at the Meadows's residence." Taylor's testimony was prohibited because it constituted hearsay and did not fall within any recognized exception. Pelletier argues that the testimony should have been allowed under the "statement against penal interest" exception to the rule prohibiting hearsay because the victim admitted to fornication, a crime in Virginia.[4] We find that Pelletier's claims are without merit.

As the party "seeking to rely upon an exception to the hearsay rule," Pelletier has the burden of establishing the admissibility of Taylor's testimony. Neal v. Commonwealth, 15 Va. App. 416, 421, 425 S.E.2d 521, 524 (1992). To come within the declaration against penal interest exception, the proponent must establish that: "(1) the declarant [was] unavailable to testify at trial; (2) the statement [was] against the declarant's interest at the time it was made; and (3) the declarant [was] aware at the time the statement [was] made that it [was] against his or her interest to make it." Randolph v. Commonwealth, 24 Va. App. 345, 355, 482 S.E.2d 101,

---

[4] Pelletier also argues that the refusal to allow Taylor's testimony violates his Sixth Amendment right to confrontation. This argument is procedurally barred by Rule 5A:18. Pelletier did not make the argument known to the trial court until three months after trial in his motion to set aside the verdict. "Thus, the objection came too late for any error to be corrected by the trial court, and for the error, if any, to constitute reversible error." Ryan v. Commonwealth, 219 Va. 439, 447, 247 S.E.2d 698, 704 (1978); see also Carter v. Nelms, 204 Va. 338, 343, 131 S.E.2d 401, 404 (1963).

105-06 (1997) (quotations and citations omitted).  Whether the declarant was aware that the statement was against her penal interest is based upon her subjective belief that she could face criminal charges.  See Chandler v. Commonwealth, 249 Va. 270, 279, 455 S.E.2d 219, 224 (1995).

Pelletier, as the proponent of the exception, fails to meet his burden on the third requirement.  No evidence exists that would indicate the victim subjectively believed she was making a statement against her penal interest when she admitted to sexual relationships outside of marriage.  We find the trial court did not err in excluding the proffered testimony.

### III.  Conclusion

We conclude that the trial court properly allowed the dog trailing evidence and properly excluded Taylor's testimony.  Accordingly, we affirm Pelletier's convictions.

Affirmed.