COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Huff, Athey and Fulton
Argued by videoconference


JOSEPH EUGENE SMITH

                                              MEMORANDUM OPINION[*] BY
v.        Record No. 0680-21-2              JUDGE CLIFFORD L. ATHEY, JR.
                                                    MAY 17, 2022
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                          Beverly W. Snukals, Judge

              Samantha Offutt Thames, Senior Assistant Public Defender, for
              appellant.

              Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,
              Attorney General; Matthew P. Dullaghan, Senior Assistant Attorney
              General, on brief), for appellee.


        Joseph Eugene Smith ("Smith") appeals his convictions and related sentences on two

counts of rape of a child under thirteen and one count of object sexual penetration of a child

under thirteen.  He was tried by a jury in the Circuit Court of the City of Richmond ("trial

court").  On appeal, Smith contends that the trial court erred by (1) denying him funds for

experts, (2) excluding certain expert testimony, (3) denying his motion to dismiss for outrageous

governmental misconduct, and (4) upholding his mandatory minimum life sentences as

constitutional.  For the following reasons, we reverse and remand.

                                    I. BACKGROUND

        In early 2019, Smith was charged with repeatedly raping and sexually penetrating his

former girlfriend's daughter over a four-year period.  After initially denying that he committed

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

the crimes, he confessed during an interrogation by law enforcement later in 2019. Following

his confession, he was arrested, indicted, and eventually convicted by a jury on two counts of

rape of a child under thirteen and one count of object sexual penetration of a child under thirteen.

He was also acquitted on two of the counts of rape of a child under thirteen. He received a

mandatory minimum life sentence on each of his three convictions.

### A. *Expert Funds & Testimony*

The only evidence of the alleged crimes was the victim's accusation and Smith's

confession. Smith sought to challenge the credibility of his confession by showing that he was

susceptible to the interrogation techniques law enforcement used in the 2019 interrogation. On

November 25, 2019, Smith, an indigent defendant, filed a motion requesting $2,500 for "an

expert in [the] coercive nature of custodial interrogations and false confessions." The court

granted that motion.

On January 30, 2020, Smith filed two additional motions for expert funds. In the first, he

asked for $4,000 to secure the interrogation expert's testimony at trial concerning the Reid

Technique and its effect on the reliability of his confession made as a result of that technique

being employed by law enforcement. In the second motion, Smith asked for $10,000 for an

expert to evaluate Smith's cognitive abilities and further to testify about Smith's heightened

susceptibility to the interrogation techniques used to obtain his confession.[1] The trial court

denied both motions for funds on February 12, 2020, saying that the video recording of the

interrogation meant that "the jury's going to see the actual tactics used by the police." The trial

court also ruled that the theoretical content of the Reid Technique was irrelevant before ruling

that, despite indications that Smith had some degree of cognitive impairment, the defense had not

"met its burden of showing a particularized need for" funds for the psychological expert.

---

[1] Smith did not raise the insanity defense.

After first filing and then abandoning a motion for an *ex parte* hearing on expert funds,[2] Smith filed a renewed motion for $7,000 to retain the psychological expert. The renewed motion was based on proffered evidence indicating that Smith may be suffering from HIV-Associated Neurocognitive Disorder ("HAND").[3] The Commonwealth opposed the renewed motion, and the trial court denied it on April 17, 2020. However, the trial court indicated that it had not "shut the door completely," and further opined that an indication from the proposed expert of exactly what it would take to confirm or rule out a diagnosis of HAND might justify granting enough funds to evaluate Smith for HAND. Finally, the trial court stated that if Smith were diagnosed with HAND, it would consider a future motion for additional funds for trial preparation and expert psychological testimony.

In response, Smith immediately filed a motion requesting $3,500 to have Smith evaluated for HAND. The newly filed motion proffered that Dr. Scott Bender from the University of Virginia Department of Psychiatry and Neurobehavioral Sciences had agreed to conduct a neuropsychological evaluation of Smith in jail. The Commonwealth opposed the motion and filed its own motion *in limine* seeking to exclude all the expert testimony Smith hoped to present at trial. On May 7, 2020, the trial court granted funds for the police interrogation expert *sua sponte* but denied the funds for the neuropsychological evaluation for HAND.

In October of 2020, during the hearing on the Commonwealth's motion *in limine* to exclude all expert testimony, the Commonwealth conceded that "the Reid Technique . . . is

---

[2] The request was made pursuant to Virginia House Bill 824, which was subsequently enacted, became effective on July 1, 2020, and was codified at Code § 19.2-266.4. 2020 Va. Acts ch. 1124. The bill provided that all indigent criminal defendants charged with a felony or Class 1 misdemeanor may request that a different judge be designated to hear an *ex parte* motion for expert funds. Code § 19.2-266.4(A). The Commonwealth filed its response on March 31, 2020, arguing that the bill was just that—a bill, not duly enacted law.

[3] Smith and the Commonwealth attached a variety of medical journal articles and law review articles to their submissions to the trial court.

outside the common juror's knowledge." However, the Commonwealth still maintained that the jury could understand how the components of the Reid Technique were used in the interrogation of Smith and the effect the technique would likely have on a person like him. The Commonwealth also argued that expert testimony on the Reid Technique should be excluded because it would be duplicative of testimony that could be elicited from the interrogator on cross-examination. Finally, the Commonwealth argued that the proposed police interrogation expert was not qualified to give expert testimony because his knowledge was based solely on watching interrogations and reading the literature on false confessions. Following the hearing, the trial court granted the Commonwealth's motion to exclude the proposed police interrogation expert's testimony.

On November 5, 2020, Smith filed yet another motion seeking expert funds to secure an expert to testify generally on the psychological factors which make a person susceptible to interrogation techniques. This time, Smith requested $7,000 but asked for at least $1,050 "to secure Dr. Aaron's presence at a future hearing to determine the admissibility of his testimony." Following a hearing on November 13, 2020, the trial court reviewed all the issues of funding and admissibility of expert evidence. It reiterated its belief that the average juror can readily understand how the interrogation techniques used during the interrogation of Smith would affect the subject of an interrogation, as well as its belief that cross-examination of the interrogator could elicit an adequate explanation of the Reid Technique. The trial court did grant $2,000 to bring Dr. Aaron, a trained psychologist, to Richmond for a pretrial hearing so that the court could determine whether this proposed expert could provide any admissible testimony. The trial court also indicated that it would consider allowing testimony laying out all or some factors that psychologists believe lead to false confessions only if the defense could offer additional

testimony tying each of the factors to Smith. Smith never secured a hearing date and never tried to bring Dr. Aaron to Richmond to proffer his testimony.

## B. *Attorney-Client Privilege*

Smith was confined in the Richmond City Jail ("jail") from the time he was arrested until the trial. The jail where he was confined stopped public visitation as a result of the COVID-19 pandemic in late March or early April of 2020. The jail only permitted attorneys and law enforcement officers to visit prisoners. Inmates were only permitted to consult with their attorneys by phone, through a glass barrier, or with a video call system that placed the attorney and the inmate in separate rooms in the jail. The video system's software automatically recorded all of these audio and video calls, but the deputies could change a setting to indicate the visit was professional and thereby prevent the video call from being recorded. Jail officials advised the Richmond Public Defender's Office, which represented Smith below from the time he was arrested, that no attorney visits were being recorded.

In October of 2020, Smith's attorneys received discovery from the Commonwealth that included a disc containing recordings of Smith's phone calls and video visits, including videos of two meetings with Smith's attorneys. One video recording was from late March of 2020 and the other from early April of 2020. Both video recordings were of privileged trial strategy meetings. In addition, in response to a request from the lead investigator in Smith's case for all of Smith's calls within a certain time frame, an official at the jail had burned the two video recordings and many recordings of non-privileged phone calls to a disc and gave that disc to the lead investigator in Smith's case. The investigator, in turn, gave a copy to the Commonwealth. Although several police recruits listened to some of the phone calls for training purposes, no investigator, police officer, or prosecutor listened to or watched the video recordings of the trial strategy meetings.

In late 2020, based on the police having recorded the two trial strategy meetings, Smith moved to dismiss the indictments or, in the alternative, exclude at trial all recordings of Smith's communications from the jail. The motion was based on the government's alleged violation of Smith's attorney-client privilege and his Sixth Amendment right to counsel. Following a hearing on the motion to dismiss, the trial court found that the government's conduct might have been negligent or even grossly negligent, but not purposeful, and therefore denied the motion to dismiss and ruled that all privileged communications were inadmissible at trial. The trial court permitted Smith's attorney to decide the method for reviewing the recordings to determine which communications were privileged and to ensure that the Commonwealth had not listened to any privileged communications.

## II. STANDARDS OF REVIEW

Whether a defendant's constitutional rights have been violated is subject to *de novo* review by this Court. *Blunt v. Commonwealth*, 62 Va. App. 1, 8 (2013) (citing *Henderson v. Commonwealth*, 285 Va. 318, 329 (2013)). We review the legal question without deference to the decision below but defer to the trial court's findings of fact unless they are plainly wrong or unsupported by the evidence. *Henderson*, 285 Va. at 329.

We "review[] a trial court's evidentiary rulings for abuse of discretion." *Graves v. Shoemaker*, 299 Va. 357, 361 (2020) (citing *Hyundai Motor Co. v. Duncan*, 289 Va. 147, 155 (2015)). A decision to deny expert funds is also reviewed for abuse of discretion, even when the denial allegedly violated the defendant's constitutional rights. *See Lawlor v. Commonwealth*, 285 Va. 187, 233 (2013). "[T]he phrase 'abuse of discretion' means that the circuit court 'has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Ellis v. Commonwealth*, 68 Va. App. 706, 711 (2018) (alteration in original) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)).

III. ANALYSIS

A. *Expert Funds & Expert Testimony*

Smith sought funding for a police interrogations expert who would have: (1) described the Reid Technique and pointed out how the technique was used in the interrogation of Smith; (2) opined that experts in his field generally contend that the Reid Technique leads to false confessions about 15% of the time, and (3) educated the jury on what factors (both intrinsic and extrinsic) make the subject of an interrogation more likely to confess to a crime even when he or she did not commit the crime. The trial court excluded all of this proposed expert testimony. Smith also sought funding to obtain a neuropsychological evaluation as well as expert testimony from a neuropsychological expert to inform the jury as to the intrinsic (personal) and extrinsic (circumstantial) factors that render an individual particularly susceptible to falsely confess under the pressure of interrogation techniques. The trial court granted some of the requests for funds but denied others.

We review each of these rulings because, although we normally decide cases on the best and narrowest grounds, if we reverse on one ruling, "we will [also] examine . . . the remaining . . . [evidentiary] issues that are likely to arise in a new trial on remand." *Emerald Point, LLC v. Hawkins*, 294 Va. 544, 555 (2017) (citing *Cain v. Lee*, 290 Va. 129, 136 (2015)); *see also Harman v. Honeywell Int'l., Inc.*, 288 Va. 84, 95-96 (citing *Velocity Express Mid-Atlantic, Inc. v. Hugen*, 266 Va. 188, 203 (2003)). However, we do not address the constitutionality of Smith's mandatory minimum life sentences.

1. Availability of Expert Funds

Smith contends that he was denied a fair trial because the trial court refused to grant him funds to pay for various experts. Except for his request for funds for a neuropsychological evaluation and for funds for a psychological expert to testify that major depression and

- 7 -

unmedicated anxiety could render a person more susceptible to give a false confession, all of the expert testimony that would have been procured through the use of these funds would have been inadmissible at trial as a result of the trial court's evidentiary rulings. Because we affirm on those issues, any potential error in refusing the requests for funds for experts to testify to those things was harmless. *See Sanchez v. Commonwealth*, 41 Va. App. 340, 352-53 (2003); *see also Payne v. Commonwealth*, 65 Va. App. 194 (2015).

The Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution guarantee indigent criminal defendants the right to be provided with "the basic tools of an adequate defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985) (quoting *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)); *Dowdy v. Commonwealth*, 278 Va. 577, 598 (2009) (citing *Husske v. Commonwealth*, 252 Va. 203, 211 (1996)). This right extends beyond the insanity defense to all issues raised at the guilt or sentencing phase which depend on the defendant's mental condition. *See Johnson v. Commonwealth*, 292 Va. 772 (2016). If the defendant is entitled to such assistance, the state must provide "access to a competent psychiatrist who will conduct an appropriate [1] *examination* and assist in [2] *evaluation*, [3] *preparation*, and [4] *presentation* of the defense." *McWilliams v. Dunn*, 137 S. Ct. 1790, 1800 (2017) (quoting *Ake*, 470 U.S. at 83).

To be entitled to this assistance, the defendant must "demonstrate that the subject which necessitates the assistance of the expert is likely to be a significant factor in his defense, and that he will be prejudiced by the lack of expert assistance." *Commonwealth v. Sanchez*, 268 Va. 161, 165 (2004) (internal quotation marks omitted) (quoting *Husske*, 252 Va. at 211-12). The defendant must therefore show a "particularized need" for the defense expert in question, which means "that the services of an expert would materially assist [the defendant] in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial."

- 8 -

*Johnson*, 292 Va. at 778. "A particularized need is more than a '[m]ere hope' that favorable evidence can be obtained through the services of an expert." *Green v. Commonwealth*, 266 Va. 81, 92 (2003) (quoting *Husske*, 252 Va. at 212). To demonstrate a particularized need for expert assistance, a defendant must have a concrete idea of what favorable evidence will be obtained. *Johnson*, 292 Va. at 778-79; *Sanchez*, 268 Va. at 166. Just "rolling the dice" in the hopes that favorable evidence will turn up does not justify the expense. *Barksdale v. Commonwealth*, 31 Va. App. 205, 211 (1999).

Here, the trial court abused its discretion in refusing Smith the funds he needed to bring an appropriate expert to testify that mental illness, including such disorders as major depression and anxiety, render a person more susceptible to confessing falsely. Smith's many proffers of proposed expert testimony made clear that mental illness and cognitive impairment, among other things, render a person more susceptible to interrogation techniques. Therefore, funding this request for expert assistance would not have condoned a fishing expedition. Expert testimony on this point was admissible, and therefore refusing those funds resulted in Smith's trial being unfair because his confession was clearly one of only two pillars—the other being the victim's accusation—supporting his conviction.[4]

The trial court also erred in refusing to grant expert funds to permit Smith to be evaluated for HAND. The trial court opined that Smith had to provide evidence that he had been diagnosed with HAND in order to receive expert funds to bring an expert to trial to testify to Smith's impaired cognitive symptoms. But Smith had proffered evidence that his longtime HIV doctor believed he "fit the profile for [HAND]," that "half of all treated HIV patients have cognitive impairment," and that cognitive impairments caused by HAND "cannot be reversed" by "antiretroviral therapy." In 2009, Smith was diagnosed with HIV Stage III (AIDS), "the most

---

[4] *See infra*, note 6 and accompanying text.

severe state of HIV infection." He had most of the risk factors for HAND, including major depression, anxiety, advanced age (over 50 years old), use of illicit drugs (marijuana), Hepatitis C co-infection, obesity, blood pressure abnormalities, hypertension, indications of previous bouts of insomnia, and "[l]ow CD4+ T cells nadir." Smith also proffered testimony from his daughter indicating that his mental faculties "began to deteriorate about 6-8 years ago" (2012-14), including memory loss and comprehension difficulties. Smith's attorneys supported that proffer by noting Smith's "limitations in terms of his comprehension of material and concepts presented by counsel."

With these indications that Smith suffered from HAND, counsel did not need a diagnosis to show that an evaluation was not just a fishing expedition. Nor could counsel have been expected to specify the exact cognitive impairments the evaluation would likely disclose.[5] Indeed, the court's two grants of funds for the police interrogation expert support our conclusion that this was not a fishing expedition. Smith wanted experts to inform the jury that a variety of cognitive impairments, mental illnesses, and psychological traits render a person more susceptible to interrogation techniques and prove that Smith had some of those impairments, illnesses, and traits. A careful review of the entire record reveals that the proffers were sufficient to show that this was no mere fishing expedition. It was enough to provide significant and uncontradicted evidence of cognitive decline and of some cognitive impairments and to point out the sorts of cognitive impairments that can accompany HAND. In light of those proffers and the constitutional rights explained in *Ake*, we have no choice but to hold that the trial court erred.

---

[5] The trial court at one point indicated that a neuropsychological evaluation alone could not yield a diagnosis and that it believed additional medical testing was necessary. Smith argued that nothing more than a neuropsychological evaluation was needed. If more testing was necessary, the trial court should have funded it as well.

Without knowing what the neuropsychological evaluation would find, we cannot say that this error was harmless. *Cf. Pritchett v. Commonwealth*, 263 Va. 182, 187-88 (2002).

2. Expert Testimony on Major Depression & Unmedicated Anxiety

The trial court also held that expert testimony explaining the effects of the interrogation techniques on a person like Smith—who had been diagnosed with major depression and anxiety, had not been taking his anxiety medications for some time before the interrogation, and had memory problems—was within the purview of the jury. The trial court believed the jury did not need an expert to "comprehend the subject matter, form an intelligent opinion, and draw its conclusions." The trial court therefore excluded expert testimony on whether and to what extent a person's major depression and unmedicated anxiety could influence the person to confess falsely under the pressure of interrogation techniques. Smith challenges this ruling.

The Commonwealth argues that Smith waived this argument because the trial court granted $2,000 to bring the psychological expert to Richmond so that the parties could *voir dire* him and attempt to convince the court that the expert could "connect the dots" between Smith's case and the factors that make a confession more likely to be false. The trial court decided to give Smith enough money to bring the expert to Richmond for a hearing and indicated it might allow testimony on those factors to the extent Smith could persuade the court that each factor could be tied specifically to Smith's confession. Contrary to the Commonwealth's argument on appeal, the court did not give Smith permission to try to convince the court to overturn its prior evidentiary rulings. Instead, it allowed Smith to try to elicit from the expert the intrinsic and extrinsic factors that applied to Smith that the trial court had not yet been presented with and for which expert testimony would be appropriate. A fair reading of the record reveals that the court was simply allowing Smith to present evidence not yet proffered to the court of factors present in his case that would make his confession more likely to be false, or perhaps other evidence

regarding the science of false confessions that could convince the trial court that it was sufficiently reliable to form the basis of expert testimony questioning the inherent effects of the Reid Technique. Because the trial court's grant of funds did not invite Smith to relitigate its ruling excluding expert testimony on Smith's major depression and unmedicated anxiety, Smith did not waive his right to contest that original denial on appeal.

In a criminal case, "an expert may testify to a witness's or defendant's mental disorder and the hypothetical effect of that disorder on a person in the witness's or defendant's situation." *Pritchett*, 263 Va. at 187 (citing *Fitzgerald v. Commonwealth*, 223 Va. 615, 629-30 (1982)). Such testimony provides "information on subjects unfamiliar to the jury." *Id.* Evidence at a pretrial hearing indicated that Smith suffered from major depression and anxiety and had not been taking his anxiety medications for some time before the interrogation. At trial, medical records showing his diagnoses of major depression and anxiety were introduced without objection. Although there may be some mental disorders or illnesses with such slight effects that an ordinary person could understand their effects on a person's susceptibility to make a false confession and draw informed conclusions without expert assistance, we do not believe that major depression and unmedicated anxiety fall within that category. Smith was therefore entitled to present expert testimony from a qualified expert on the susceptibility of a person suffering from major depression and unmedicated anxiety to making a false confession.

Our view is confirmed by other Virginia cases addressing the effects of mental disorders and illnesses, medications, and intoxicating beverages. The effects of the following on susceptibility to interrogation techniques are outside the common knowledge of the jury: low IQ, *id.* at 185-87; antisocial personality disorder, *Coppola v. Commonwealth*, 220 Va. 243, 252-53 (1979); and dissociative disorders, *Orndorff v. Commonwealth*, 45 Va. App. 822 (2005), *rev'd on other grounds*, 271 Va. 486 (2006). Also outside the common knowledge of the jury

are "the *individual* and *cumulative* effects of LSD, Tranxene, and alcohol." *Fitzgerald*, 223 Va. at 629 (emphasis added). The average juror surely knows something about the physiological and psychological effects of excessive alcohol consumption, but we have nonetheless allowed expert testimony on those effects in criminal cases. *Id.* Similar rationales apply to expert testimony on other subjects. *Wakeman v. Commonwealth*, 69 Va. App. 528, 536 (2018) (approving expert testimony on the forensic examination of sexual assault victims); *Stevens v. Commonwealth*, 72 Va. App. 546, 554-55 (2020) (allowing expert testimony on delayed disclosure of child sexual abuse); *Pelletier v. Commonwealth*, 42 Va. App. 406, 419-22 (2004) (allowing expert testimony on the use of tracking dogs).

Accordingly, we believe that, although many people have some familiarity with depression and anxiety and some other relatively common mental illnesses, an expert would have been appropriate in this case because of the diagnosis of major depression and the defendant's failure to take his anxiety medication for some time prior to the interrogation. The nature of the trial court's refusal to admit this testimony and refusal to provide expert funds prevents us from being "sure that [the error] did not 'influence the jury' or had only a 'slight effect.'" *Shifflett v. Commonwealth*, 289 Va. 10, 12 (2015) (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001)). We do not know how the experts Smith requested would have testified regarding the hypothetical susceptibility to falsely confessing a person would be who suffered from major

depression and had not taken his anxiety medications in some time.  Therefore, we cannot draw a firm conclusion about how such testimony would or would not have affected the jury's decision.[6]

### 3. Relevance of Psychological Factors

The trial court also ruled that expert psychological testimony on the intrinsic and extrinsic factors that render a confession more likely to have been given falsely would only be relevant if Smith also produced evidence showing that those factors applied to him.  Relevant evidence is generally admissible.  Va. R. Evid. 2:402(a).  Evidence is relevant if it has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence."  Va. R. Evid. 2:401.  "The scope of relevant evidence in Virginia is quite broad, as '[e]very fact, however remote or insignificant, that tends to establish probability or improbability of a fact in issue is relevant.'"  *Morgan v. Commonwealth*, 73 Va. App. 512, 527 (2021) (alteration in original) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016)).

If Smith's expert had been allowed to give a list of factors that tend to show that a confession is false, the Commonwealth could have pointed to the absence of proof of any one of those factors as an indication that the confession was more likely to be true.  Therefore, the trial court erred in holding that the list of intrinsic and extrinsic factors that render a subject more likely to falsely confess under the pressures of an interrogation were relevant only to the extent that they were present in this case.  However, we "can[] say, with fair assurance, . . . that the

---

[6] Some evidence suggested that Smith had recently withdrawn financial assistance to the victim's family.  Additionally, the victim had gotten in trouble at school for choking a fellow student, and when asked by her mother if she was acting out because she was being abused, the victim said that abuse was the cause and accused Smith of sexually abusing her.  We cannot and do not pass any judgment on whether the victim is telling the truth.  Instead, we are called upon to determine whether the jury would have convicted Smith if he had presented expert testimony questioning the reliability of his confession.  We are uncertain what conclusion the jury would have reached if it had been confronted with such testimony because it might have influenced the jury to consider the victim's motives to fabricate in a different light and might have come to a different conclusion.

judgment was not substantially swayed by the error." *Tomlin v. Commonwealth*, 74 Va. App. 392, 410 (2022) (quoting *Commonwealth v. Swann*, 290 Va. 194, 201 (2015)).  Here, to the extent that the trial court excluded testimony regarding the factors which were not present in this case, the error was harmless because such testimony would have only assisted the Commonwealth in proving that Smith was more likely to have committed the alleged criminal acts.[7]

### 4.  Description of the Reid Technique

The trial court ruled that Smith's proposed expert testimony describing the Reid Technique and how it was used in the interrogation would be needlessly cumulative because Smith could elicit that testimony on cross-examination of the interrogator.  Virginia courts may exclude otherwise admissible evidence if it is "needlessly cumulative."  Va. R. Evid. 2:403(b).  Although Smith's interrogation expert might have expounded in a more thorough and learned fashion on the Reid Technique than the interrogator did, at trial the interrogator explained the Reid Technique and candidly admitted the manner in which it and other interrogation techniques were used during the interrogation.  Therefore, we cannot say the trial court abused its discretion in excluding cumulative expert testimony on the same matters.  *See May v. Caruso*, 264 Va. 358, 363 (2002).

### 5.  Expert Qualifications of Police Interrogation Expert

The trial court also held that Smith's proposed interrogation expert was not qualified to discuss the factors that psychologists contend render a person more likely to confess falsely.  However, even if the trial court was in error, Smith later proposed that a neuropsychological expert should be permitted to give the same testimony.  Since the neuropsychological expert had

---

[7] As discussed above, Smith was entitled to present expert testimony tying his major depression and unmedicated anxiety to his susceptibility to interrogation techniques because that evidence was relevant and expert testimony was appropriate.

received extensive training in psychology, the Commonwealth did not challenge whether the neuropsychological expert was qualified to testify as to those factors and the point of contention was over the admissibility of the testimony. In other words, Smith had an opportunity to and did propose expert testimony presenting the same evidence through a different expert with unchallenged qualifications. Any error in finding the proposed interrogation expert unqualified was therefore harmless. *See Tomlin*, 74 Va. App. at 410 (quoting *Swann*, 290 Va. at 201).

### 6. Criticism of the Reid Technique

Having disposed of some of the expert evidentiary issues on other grounds, we turn to the issues requiring analysis of Virginia's expert testimony rules. The trial court excluded testimony from Smith's proposed interrogation expert on "the surprising frequency of false confessions" because the science of false confession work was not sufficiently reliable and because the proposed expert had insufficient experience. Neither ruling was an abuse of discretion.

In criminal cases, "expert testimony is admissible" if three requirements are met: (1) "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the subject matter is beyond the knowledge and experience of ordinary persons, such that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions;" and (3) the "witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Va. R. Evid. 2:702(a)(i)-(ii). An expert may testify regarding the "physical and psychological environment surrounding a confession," including "a witness's or defendant's mental disorder and the hypothetical effect of that disorder." *Jackson v. Commonwealth*, 266 Va. 423, 438 (2003) (quoting *Pritchett*, 263 Va. at 187).

First, Smith contends that the trial court erred by relying on a *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), analysis that the Virginia Supreme Court has rejected,

rather than a *Spencer v. Commonwealth*, 240 Va. 78 (1990), analysis. If the expertise is based on scientific knowledge, the court generally must make "a threshold finding of fact with respect to the reliability of the scientific method offered." *Spencer*, 240 Va. at 97. The trial court specifically held this testimony was unreliable under either *Daubert* or *Spencer*. This holding included the trial court's separate and independent decision that the testimony was unreliable under *Spencer*.

Second, Smith argues that the interrogation expert was sufficiently experienced to be qualified as an expert. Expert testimony may be based on experience, such as experience with tracking dogs that shows the use of dogs in that capacity is reliable, but the court must still find the expertise reliable. *Castillo v. Commonwealth*, 70 Va. App. 394, 436-38 (2019) (first citing *Pelletier*, 42 Va. App. 406; then citing *Epperly v. Commonwealth*, 224 Va. 214, 233 (1982)). The trial court noted that the expert had never interrogated anyone or been a witness to a verifiably false confession and the circumstances surrounding it. Simply watching many interrogations does not give a person experience in understanding whether those confessions are false in the same way that arresting drug users and distributors teaches a police officer what quantities are kept for personal use and what quantities are kept for distribution, or in the same way that working with tracking dogs for years makes a person aware of how accurate those dogs are at tracking. *See Pelletier*, 42 Va. App. at 417-21.

Third, Smith argues that the trial court abused its discretion in deciding that the field of false confessions work was not reliable. We note that the field of knowledge underlying this evidence is not identical with the field of psychology, which underlies psychologists' understanding of what factors would render a particular person susceptible to make a false confession under the pressure of interrogation techniques. The science or field of false confessions work is narrow in scope and is still in the early stages of development. The peculiar

difficulties of verifying the truth or falsity of confessions have not yet been resolved in any way that allows observers in the field of false confessions to gather sufficient samples of empirical data from which to draw sufficiently reliable conclusions about how likely the Reid Technique is, in general, to produce a false confession in the context of an accusation of a serious crime such as murder or child abuse. *See, e.g.*, Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions*, 88 J. Crim. L. Criminology 429 (1998) (evaluating sixty confessions, some of which were considered *proven* false and some of which were considered *probably* false). An additional empirical problem arises from the need to compare false confessions to the total number of confessions, and to then compare true and false confessions secured by interrogation techniques to those secured by purely investigative techniques. In light of these uncertainties in a developing field of knowledge, we cannot say that no reasonable jurist could have reached the same conclusion as the trial court on this point.

## B. *Outrageous Government Misconduct*

Smith also argues that the Commonwealth violated his Sixth Amendment right to counsel by recording privileged trial preparation meetings and transmitting the recordings to investigators and prosecutors. Smith contends that the trial court erred in refusing to dismiss the indictments with prejudice or to provide some other remedy above and beyond excluding the two video recordings of privileged trial strategy meetings. We disagree.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. A defendant seeking to vindicate his or her Sixth Amendment right to counsel must prove (1) government interference with the right to counsel or (2) deficient and prejudicial performance by defense counsel. *Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006).

Here, there is no dispute that the right to counsel had attached. *See Rothgery v. Gillespie County, Tex.*, 554 U.S. 191, 198 (2008).

Since *Weatherford v. Bursey*, 429 U.S. 545 (1977), the United States Supreme Court repeatedly declined to grant certiorari to address whether the Sixth Amendment protects a criminal defendant's right to confidential attorney-client communications. *E.g.*, *Kaur v. Maryland*, 141 S. Ct. 5 (2020). Prior Supreme Court cases avoided the question but held that, at the very least, a showing of prejudice was required to obtain a judicial remedy. In *Hoffa v. United States*, 385 U.S. 293, 309 (1966), the Supreme Court assumed without deciding that a government informant's presence at defense preparation meetings had violated the Sixth Amendment right to counsel but refused to dismiss the indictment and hinted that the remedy would likely be exclusion of evidence. In *Weatherford*, the Court addressed a similar situation and held: "There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by [the informant], there was no violation of the Sixth Amendment . . . ." 429 U.S. at 558. The Court emphasized that "unless [the informant] communicated the substance of the [confidential attorney-client] conversations and thereby created at least a realistic possibility of injury to Bursey or benefit to the State, there can be no Sixth Amendment violation." *Id.*

We once assumed without deciding that a violation of the attorney-client privilege also violated the right to counsel, but that the defendant in that case was not entitled to a judicial remedy because he was not prejudiced. *See Gheorghiu v. Commonwealth*, 54 Va. App. 645 (2009), *rev'd in part on other grounds*, 280 Va. 678 (2010). Since then, neither this Court nor the Virginia Supreme Court has addressed the issue. *Gheorghiu* therefore requires Smith to show that the recording and disclosure of his privileged trial strategy meetings harmed him

during the criminal proceedings.[8]  *Id.*  Even if *Gheorghiu* could be read to say that *Weatherford* held—in the context of a Sixth Amendment challenge to governmental interference with confidential attorney-client communications—that prejudice is merely a predicate to obtaining a judicial remedy, *see United States v. Morrison*, 449 U.S. 361 (1981), rather than a predicate to showing a violation of the right to counsel, *see Gonzalez-Lopez*, 548 U.S. at 146, the result in this case is the same.

Here, the trial court found that although there was an existing recording of the two privileged video calls, only Smith's attorney had ever watched them.  Although police recruits listened to some of the phone calls, none of those calls contained privileged communications.  No investigator or recruit watched or listened to the privileged video calls.  Nor did any member of the prosecution team.  Just as in *Weatherford*, prosecutors and investigators never learned or used any confidential information.  Even if we were to hold that Smith's Sixth Amendment right to counsel had been violated, we would still conclude that he is not entitled to any remedy because he failed to show that he was prejudiced.

## IV. CONCLUSION

For the foregoing reasons, we reverse the convictions and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

[8] *Gheorghiu* also sidestepped the significance of the degree to which the governmental intrusion was intentional, an issue other courts have resolved with different approaches. *Compare United States v. Levy*, 577 F.2d 200, 208 (3d Cir. 1978), *with United States v. Brugman*, 655 F.2d 540, 546 (4th Cir. 1981), *and United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985).